UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

DEBRA COSENTINO, ET AL,                    :    301CV2129 (AVC)

    *Plaintiffs*,                          :

v.                                         :

                                               CONSOLIDATED CASES
PITNEY BOWES, INC. and                     :
IMAGISTICS INTERNATIONAL, INC.,

    *Defendants*.                          :

                                           :    Feb. *16* , 2004

### PLAINTIFFS' LOCAL RULE 56(a)(2) STATEMENT

**PART I**
**Response to Each Numbered Paragraph of**
**Defendants' Local Rule 56(a)(1) Statement**

1.    Admit.

2.    Admit.

3.    Deny.  Sentence one - Deny.  See ¶s 60-62, 68, 72, 77, 90, 91, 93, 105, 115-116, 117 119 of Part II, "Issues of Material Fact to be Tried," below.[1]  Sentence two - Deny.  See MF ¶s 60-62, 68, 72, 77, 90, 91, 93, 105, 115-116, 117 119.  Sentence three - Deny.  See MF ¶ 10.

---

[1]  The paragraphs in Part II of Plaintiff's Statement are cited "MF ¶ __ ."  All references to deposition transcripts, discovery documents and affidavits appear in those paragraphs.

4.    Deny.   Sentence one - Deny.   See MF ¶s 123. Sentence
two - Admit that Plaintiff Benton did not use the words "sex
based or otherwise a form of sexual harassment."   Deny that Mr.
Simpson's conduct was not in fact sex based or otherwise a form
of sexual harassment and deny that Pitney Bowes Personnel Depart-
ment was not aware of that fact. See MF ¶s 30, 32, 36, 40- 41,
44, 47-49, 51-54, 56-65, 68, 69-120.

5.    Deny.   Sentence one - cannot admit or deny because
Plaintiffs do not know what "a complaint of this kind" means.
Sentence two - Deny for several reasons.   Plaintiffs do not admit
or deny that there were any subsequent complaints against Mr.
Simpson.   The absence of subsequent complaints, if there are
none, would mean nothing since Defendants were aware of the
charges of discrimination brought by Plaintiffs and Mr. Simpson
would logically be on his best behavior.   See, e.g., Chuang v.
University of California at Davis, 225 F.3d 115, 1129 (9th Cir.
2000) ("nondiscriminatory employer actions occurring subsequent
to the filing of a discrimination complaint will rarely even be
relevant as circumstantial evidence in favor of the employer");
accord Lam v. Univ. of Hawaii, 40 F.3d 1551 n. 17 (9th Cir.
1994); Hill v. Airborne Freight Corp., 212 F.Supp.2d 59, 68

(E.D.N.Y. 2002).  And even if the Court decided to consider the absence of subsequent complaints, weighing the strength of the inference so created is for the jury.  Since the Plaintiffs are the non-movants the Court would be bound to find that for the purposes of this motion the absence of subsequent complaints is not evidence that he did not perform the acts which gave rise to Plaintiffs' complaints.  Furthermore, the affidavit signed by Ms. Stevens refers only to complaints against Mr. Simpson "registered with Human Resources."  Her ambiguous disclaimer does not exclude complaints made to managers, complaints made to administrative agencies or complaints filed in court.  Finally, after his transfer to another department Mr. Simpson had no direct reports and thus no opportunity to harass female employees as he had formerly done.  See MF ¶ 16.  Plaintiffs know that he continued to harass them after he left by advising their new supervisor, Brenda West, on their commissions.  See MF ¶ 16.

6.    Admit and Deny.  Sentence one, two and three - Admit. Sentence Four - Deny.  It was not a true apology.  Mr. Simpson made it clear that he did not mean it.  See MF ¶ 39-40.  Nor was there a real apology from Ms. Stevens.  She just didn't want to hear about it anymore.  See MF ¶ 39.

7.    Admit that Mr. Simpson banged his fist.  Deny that he "typically" did so at meetings.  Mr. Simpson hit a lot of things with his fist on a lot of different occasions.  See MF ¶s 28, 31.

8.    Admit and Deny.  Sentence one – Admit that at times Mr. Simpson praised a female rep.  Deny that Mr. Simpson gave male and female reps equal praise.  Mr. Simpson praised Darryl Schneider more than he deserved, praised him when he did not deserve it, and failed to praise the female reps when they did deserve it.  Mr. Simpson also damned female reps with faint praise and insulted them in the form of compliments.  MF ¶s 51, 105, 112-17.  Sentence two – Admit that Plaintiff Cosentino received praise.  Denied that she received as much praise as she should have received given her high level of performance.  See MF ¶ 116-17.  Mr. Schneider was offered a raise to stay in the ECO room although his performance was both poor and declining.  MF ¶ 117.

9.    Admit.

10.    Admit and Deny.  Admit that there was a phone call quota.  Deny that Plaintiff Benton, Plaintiff Cifatte and Plaintiff Buonincontra failed to meet the quota more often than not.  See MF ¶s 77.  Deny that there was a monthly sales quota.  Mr. Simpson set "quotas" by whim, according to he liked and disliked,

4

changed them on impulse, and told different people different versions of the quotas.  See MF ¶s 60-62.

11.    Deny.  Sentence one - Deny.  Mr. Simpson sexually touched Plaintiff Moore and Plaintiff Cifatte in a sexually offensive manner.  See MF ¶s 106-09.  Sentence two, first clause - Deny.  If the word "sexually" in the phrase "sexually charged comments" is interpreted to mean "sex" in the sense of sexual activity, Mr. Simpson made at least one sexually charged comment to Plaintiff Moore.  MF ¶ 110.  If the word "sexually" in the phrase "sexually charged comments" is interpreted to mean "sex" in the sense of gender, Mr. Simpson made many more sexually charged comments.  See MF ¶s 30 ("you girls"), 31 (referring to Plaintiff Cifatte as the "help"), 36 ("you women"), 95 ("these women"), 97 (you women"), 98 ("you women"), 99 ("you women"), 101 ("you girls"), 102 ("you women"), 104 (women were made to stay home and take care of their children and cook for their husbands), 105 ("the girls" and "the women"), 111 (attractive women "normal" and unattractive women not normal or "left of normal"), 114 ("you women").

12.    Admit, but see also MF ¶ 72.

13.    Admit and Deny.   Sentence one - Deny.   Mr. Simpson and Mr. Schneider, in the ECO room and in the presence of Plaintiffs Benton, Buonincontra and Cifatte, discussed the fact that they had met at a high school athletic event, had sat together to watch it, and had discussed the event afterward. See MF ¶ 114. Sentence two - Deny.   It was a routine occurrence and the conversations lasted for long period of time.   Mr. Schneider also ran a sports betting operation, prohibited by Pitney Bowes, out of the ECO room, and Mr. Simpson participated in it.   See MF ¶s 113-14. Sentence three - Admit.   Sentence four - Admit, but the reason Plaintiffs did not talk to Mr. Simpson was that he harassed and abused them.   Nor did Mr. Simpson give the female reps time to discuss sports in the office, as he did Mr. Schneider.   See MF ¶ 113.

14.    Admit.

15.    Admit.

16.    Plaintiffs lack information with which to admit or deny sentence one.   Sentence two - Deny.   It was clear that Defendant Pitney Bowes was transferring the work to Denver and getting rid of the remaining Plaintiffs.   See MF ¶ 17.

**PART II**
**Material Facts as to Which it Is Contended**
**That There Is a Material Issue to Be Tried**

### Background

1.     The ECO Group was a telephone sales operation.  Employ-
ees of Defendant Pitney Bowes - the sales representatives, or
"reps -  sold refurbished cartridges to customers who balked at
buying new Pitney Bowes cartridges.  Cifatte Dep. Tr. 62; Benton
Dep. Tr. 132.

2.     At first the ECO Group was in Shelton, Connecticut.
The reps worked on the first floor of the building.  The manager
responsible for the ECO Group, Gary Simpson, worked on the third
floor.  Cifatte Dep. Tr. 59, 65-66; Buonincontra Dep. Tr. 106.
When customer paperwork had to be signed the reps climbed the
stairs to Mr. Simpson's office.  Cifatte Dep. Tr. 65-66.  Mr.
Simpson's secretary was Mary Iaffaldano.  Cifatte Dep. Tr. 85-86.
The reps had minimal contact with Mr. Simpson during that time.
Buonincontra Dep. Tr. 22.

3.     The ECO Group moved to Defendant Pitney Bowes's
Trumbull office in May, 1999.  Cifatte Dep. Tr. 68.  The reps
were then Plaintiff Buonincontra, Plaintiff Cifatte, Plaintiff
Cosentino and Darryl Schneider.  Cifatte Dep. Tr. 69.

4.    The ECO Group room in Trumbull was tiny, only eight feet by eight feet, and had five people in it. It was noisy and there was a lot of cross talk. Cifatte Dep. Tr. 223; Moore Dep. Tr. 91; Cosentino Dep. Tr. 90. The reps could hear each other's conversations even when they spoke in a normal tone. Cifatte Dep. Tr. 72, 74; Moore Dep. Tr. 199-200

5.    The reps had to make a certain number of calls per day, Benton Dep. Tr. 148-49, and obtain a certain number of signed account agreements. Benton Dep. Tr. 151.

6.    The reps found accounts by looking in a sales history database. The reps were not supposed to sell reconditioned cartridges to customers who were already buying new cartridges from Pitney Bowes. The reps found potential customers by finding companies with Pitney Bowes machines who were not ordering Pitney Bowes cartridges. This showed that the customers were getting cartridges from someone else, making them fair game. Benton Dep. Tr. 148; Buonincontra Aff. ¶ 5.

7.    The reps would bring the signed contracts over to Mr. Simpson's desk. Mr. Simpson would go over the pricing, research it and then sign off on it. From there the agreement went to Ms.

Iaffaldano.  She kept a list of signed agreements on her com-
puter.  Benton Dep. Tr. 151-52.

    8.    The reps got points towards quota for making sales.
Buonincontra Dep. Tr. 225.  The quota was twenty sales per month
- fewer sales than twenty and the rep got no commission, more
sales than twenty led to increased commission.  Cosentino Dep.
Tr. 159.  Getting a signed agreement did not entitle a rep to
points towards quota or compensation.  The reps only got credit
when the account actually ordered.  Benton Dep. Tr. 144.

    9.    A carryover list showed the accounts who had signed
agreements during a month but had not ordered yet.  Benton Dep.
Tr. 147.  Each month each rep was supposed to review her carry-
over list, correct it and sign it.  Benton Dep. Tr. 149-50.
Inaccuracies were supposed to be reported to Ms. Iaffaldano.
Benton Dep. Tr. 150.  There were a lot of companies on the list
and it was difficult for the reps to make sure that they were
accurate.  Benton Dep. Tr. 148-49.  An inaccuracy on the carry-
over list would be a company which had in fact placed an order or
an account which had signed an agreement but which for some
reason was not on the list.  Benton Dep. Tr. 150.  At times the

reps wouldn't catch an error for a month or two.  Benton Dep. Tr. 151.

10.    The account file folders were divided among the reps by the letters of the alphabet.  Benton Dep. Tr. 147.  The computer database was in theory available to all reps equally but this was not true in practice.  Mr. Simpson reserved all major accounts for himself.  This was an exception to the alphabetical division of accounts.  Mr. Simpson would claim all divisions and subsidiaries of all major accounts as his own as well.  A list of affiliated accounts, such as parent and subsidiary, was supposed to be circulated on a regular basis, but this did not happen. There was no way for the reps to know who was or was not affiliated with Mr. Simpson's accounts.  The reps did not have the time and resources to research company affiliations on their own and never knew if Mr. Simpson was correct in claiming the account. Benton Aff. ¶ 5; Moore Aff. ¶ 3.

11.    Ms. Iaffaldano kept track of the sales made and points earned by the reps.  Buonincontra Dep. Tr. 225-26; Cosentino Dep. Tr. 161.  The reps compared Ms. Iaffaldano's list to their own records.  Cosentino Dep. Tr. 163.  Ms. Iaffaldano was notorious for making mistakes in tallying sales and points.  She wrote the

wrong company, the wrong rep, the wrong price - she couldn't even spell the names of the accounts. Buonincontra Dep. Tr. 225-26; Benton Dep. Tr. 296; Cosentino Dep. Tr. 161. The reps were responsible for keeping their own records of sales and, as a result, believed their own records more than they believed those kept by Ms. Iaffaldano. Buonincontra Dep. Tr. 226; Cosentino Dep. Tr. 161. The reps complained to Mr. Simpson about Ms. Iaffaldano's errors and even kept a folder of conspicuous mistakes to show him. Benton Dep. Tr. 296-97. The reps reported mistakes in the sales and points records to Ms. Iaffaldano all the time. Buonincontra Dep. Tr. 227. Sometimes Ms. Iaffaldano changed them, sometimes she didn't. Some of the discrepancies were the result of orders by Mr. Simpson. Buonincontra Dep. Tr. 226-27.

12.   When Plaintiff Moore was hired, she, Ms. Iaffaldano and Mr. Simpson would conference at the end of the month to tally points. Moore Dep. Tr. 128-29. Every month the reps had to meet individually with Mr. Simpson to go over their closes and orders. Cosentino Dep. Tr. 160. At these meetings they went over the discrepancies between the records kept by the reps and the records kept by Ms. Iaffaldano. Cosentino Dep. Tr. 161-62.

13.    The computer database used by the reps had many problems.    The reps spent a great deal of time calling clients no longer in existence, companies who had merged, companies who no longer had Pitney Bowes equipment, or companies which turned out to be part of larger companies which handled by Mr. Simpson as one of his own personal accounts.    Moore Dep. Tr. 91-93.    The database was supposed to be accurate but it was not and it took the reps a lot of time to research the correct phone and account numbers.    Moore Dep. Tr. 124.    Every rep, not just the Plaintiffs, had problems with the database.    Moore Dep. Tr. 93.    It was an ongoing concern.    Cosentino Dep. Tr. 117-18.

14.    As time went on the database got more and more fished out.    There were fewer and fewer companies interested in buying Pitney Bowes cartridges in it.    Moore Dep. Tr. 136.    Constant addition of account names to the database did not help the ECO reps make sales because almost without exception the names being added were those of new accounts which they could not approach for months or even years.    Buonincontra Aff. ¶ 5.

15.    The reps and Mr. Simpson met every Monday morning. Mr. Simpson discussed the performance of each rep and put the figures for the previous week up on the blackboard.    Cifatte Dep.

Tr. 324; Moore Dep. 206; Buonincontra Dep. Tr. 282; Benton Dep.
Tr. 150-51; Cosentino Dep. Tr. 172.  Mr. Simpson wrote down how
many account agreements were sent out to the customers, how many
came back signed, how many of those customers orders and how many
of the sales had actually closed.  Cosentino Dep. Tr. 173.  Mr.
Simpson would say where each rep was at a particular time.
Buonincontra Dep. Tr. 213.  It was a small group in the ECO room;
everyone knew where everyone was on sales without a formal
process to advise them.  Moore Dep. Tr. 143.

16.    In 2001 Mr. Simpson was transferred out of the ECO
room to a position under Nat Gifford in which he had no direct
reports.  Moore Aff. ¶ 5.  He was replaced by Brenda West.
Unfortunately Ms. West had no idea what the ECO operation was
about, or even how to run a sales operation, Moore Dep. Tr. 152,
so Ms. West would ask Mr. Simpson what to do with accounts.  Mr.
Simpson ended up tallying commissions, deciding whether a certain
person could contact a certain account and making pricing deci-
sions.  Moore Dep. Tr. 154-55; Benton Dep. Tr. 199-200.

17.    In the fall of 2001 Mr. Simpson went to Denver to
train employees to perform the work of the ECO Group.  Benton
Aff. ¶ 16.  Imagistics was spun off from Defendant Pitney Bowes

on Dec. 3, 2001.  Moore Dep. Tr. 251.  Plaintiffs Moore and
Cifatte, the Plaintiffs who had not already left, were let go by
Imagistics on Dec. 14, 2001.  Moore Dep. Tr. 50, 251.

18.    Plaintiff Benton was a highly experienced and success-
ful employee of Defendant Pitney Bowes when she joined the ECO
Department. Plaintiff Benton had been a group leader in the
supply line and administrative assistant to the national director
of mailing systems. Benton Dep. Tr. 111, 115.  In addition
Plaintiff Benton had had years of direct sales experience.
Benton Dep. Tr. 112-13.  Plaintiff Benton had received awards for
hitting high targets and had also won trips.  Benton Dep. Tr.
115.

19.    Plaintiff Buonincontra was a very experienced and
qualified Pitney Bowes employee when she started work in the ECO
room.  She had a great deal of sales experience.  One of her
suggestions had led Pitney Bowes to create a pilot program in
supply sales.  Buonincontra Dep. Tr. 62-67, 73, 79.

20.    Plaintiff Cifatte was a highly experienced and suc-
cessful Pitney Bowes employee when she joined the ECO Department.
Cifatte Dep. Tr. 48-52, 55-59, 310.  Plaintiff Cifatte regularly
met her quota while the ECO Group was in Shelton.  Cifatte Dep.

14

Tr. 88.  Plaintiff Cifatte wasn't supposed to get commission the first three months, but because she met quota from the very first month Mr. Simpson had to give it to her.  Cifatte Dep. Tr. 91.

21.    Plaintiff Cosentino was a skilled, experienced Pitney Bowes employee before she worked at the ECO Group.  Cosentino Dep. Tr. 80.  She was very successful and won many awards.  Cosentino Dep. Tr. 80.

22.    Plaintiff Moore had a substantial corporate background, though no sales experience, when she joined Pitney Bowes.  Moore Dep. Tr. 23-35.

### Simpson's Loud, Physically Threatening, Abusive and Demeaning Words and Conduct

23.    Mr. Simpson was moody, erratic and unpredictable.  Buonincontra Dep. Tr. 141-42.  He'd fling open the door to the ECO room and after that you just never knew what was going to happen.  Buonincontra Dep. Tr. 141-42.  Mr. Simpson had temper tantrums and went into rages.  Buonincontra Dep. Tr. 161.  At one point Plaintiffs Benton and Cifatte took the back way to get to another part of the building so they wouldn't run into him by chance.  Buonincontra Dep. Tr. 163-64.

24.    Mr. Simpson had a habit of yelling at Plaintiff Cifatte in the ECO room.  Everyone could hear it because the room

15

was so small.  Buonincontra Dep. Tr. 140.  Mr. Simpson had a
habit of raising his voice in general.  Buonincontra Dep. Tr. At
141-42.

25.    Plaintiff Benton saw Mr. Simpson physically block
Plaintiff Cifatte from leaving her work area, saying "I'm not
through yet."  Benton Dep. Tr. 275.

26.    At deposition Plaintiff Cosentino recalled an inci-
dent while the ECO Department was in Shelton where Mr. Simpson
absolutely exploded and started screaming at the reps over a
minor issue, namely the reps taking food from a meeting rom back
to their desks.  Cosentino Dep. Tr. 93.

27.    In 1999 Plaintiff Cifatte, Plaintiff Buonincontra,
Plaintiff Cosentino and Darryl wrote Mr. Simpson a letter about
how the problems with the database were causing them problems.
Cifatte Dep. Tr. 230.  A meeting followed.  Mr. Simpson became
angry, hit the cabinet and said "What the fuck do you want me to
do?"  Cifatte Dep. Tr. 230.

28.    At Monday morning meetings Mr. Simpson would pound his
fist on the table and get red in the face.  Cifatte Dep. Tr. 289;
Buonincontra Dep. Tr. 268-69.  Plaintiff Cifatte found this habit
upsetting.  Cifatte Dep. Tr. 290.  Plaintiff Benton many times

16

got so upset as a result of Mr. Simpson's conduct at the Monday morning meetings that she couldn't breathe. She had to use her asthma inhaler and also take a tranquilizer. Benton Dep. Tr. 68-69.

29. At one Monday morning meeting Mr. Simpson criticized Plaintiff Buonincontra in front of her peers for saying something to Ms. Iaffaldano. For the rest of the meeting he stared at her in an intimidating way, visibly angry, and made sarcastic remarks if she did so much as cough. Plaintiff Buonincontra felt that Mr. Simpson's staring and sarcasm was designed to harass and intimidate her and make her lose her temper. Buonincontra Dep. Tr. 269-71.

30. Mr. Simpson raised his voice to Plaintiff Buonincontra when they had closed door meetings in his office. Buonincontra Dep. Tr. 103. This didn't happen when he was talking production numbers; Mr. Simpson got frustrated and loud when talking about the women in the room. Buonincontra Dep. Tr. 105. Mr. Simpson made sarcastic remarks. Benton Dep. Tr. 271. He said that the women were "all cut from the same cloth" and "Can't you girls do anything right?" Benton Dep. Tr. 272-73.

17

31.    Mr. Simpson had a habit of hitting the file cabinets in the ECO Group room, to get the attention of the reps or just out of frustration.  Buonincontra Dep. Tr. 141, 268.  Mr. Simpson hit desks, tables and cabinets in the room.  Benton Dep. Tr. 268.

32.    Early in her time with the ECO Group, Plaintiff Cifatte was on a three way call with Mr. Simpson and the manager of another branch.  Mr. Simpson was bullying during the call, acting like Plaintiff Cifatte didn't know the right answers, and saying "see what kind of help you get nowadays?"  Plaintiff Cifatte felt like quitting. Cifatte Dep. Tr. 84-85.  It was the first time that she had ever been humiliated in front of someone like that.  Cifatte Dep. Tr. 87.

33.    Mr. Simpson screamed so loud in the ECO room that people in the lab next door heard it through a concrete wall and came running in to see what had happened.  Moore Dep. Tr. 167-68.

34.    Mr. Simpson slammed the drawers of the big file cabinets in the ECO room.  Buonincontra Dep. Tr. 20, 280.

35.    Mr. Simpson used to walk up behind Plaintiff Cifatte without announcing himself.  She would jump, startled, when she learned that he was there.  Cifatte Dep. Tr. 304-05.

18

36.    Mr. Simpson came in late on Aug. 30, 2000.  Benton
Dep. Tr. 187.  He stormed into the room.  Benton Dep. Tr. 187;
Cifatte Dep. Tr. 180.  It was approximately 10:30 AM.  Plaintiff
Cifatte was at Plaintiff Cosentino's cubicle handing her a file.
Cifatte Dep. Tr. 180.  Mr. Simpson asked Plaintiff Cosentino
about pricing on a contract.  Benton Dep. Tr. 187; Cosentino Dep.
Tr. 125.  Plaintiff Cifatte was starting to walk away when Mr.
Simpson said to her "Oh Kim, could you look up a price on this,"
or "pull up this account."  Plaintiff Cifatte relied "Okay."
Benton Dep. Tr. 187; Cifatte Dep. Tr. 180.  Plaintiff Cifatte
started walking back to her cubicle and then said to Mr. Simpson
"Oh, my computer's still down," Cifatte Dep. Tr. 180, meaning
that she did not have a computer and could not look it up the
price for him.  Cifatte Dep. Tr. 187; Benton Dep. Tr. 187;
Cosentino Dep. Tr. 125-26.  The computer had been down for three
weeks.  Cifatte Dep. Tr. 180.  The other reps had computers that
worked.  Cifatte Dep. Tr. 187.  Mr. Simpson lunged at Plaintiff
Cifatte.  She was afraid that he was going to slap her.  Cifatte
Dep. Tr. 296.  Mr. Simpson was so close that she could feel his
breath on her face.  Cifatte Dep. Tr. 297.  Mr. Simpson then went
into an "outrageous rage," punching the file cabinet, Cosentino

19

Dep. Tr. 126, and saying "Kim, I'm so goddamn sick of you and your goddamn computer. If I could shit you out a computer, I would. Do you hear me, if I could shit you out a computer, I would. I'm so goddamn sick about you and that goddamn computer." Cifatte Dep. Tr. 180; Benton Dep. Tr. 187; Cosentino Dep. Tr. 126. Plaintiff Benton recalls Mr. Simpson saying "Everybody on the third floor knows that you haven't had a computer." Benton Dep. Tr. 187. Plaintiff Cifatte went to her cubicle, which was about four feet away, and collapsed into her chair. Cifatte Dep. Tr. 313. She started crying. She was embarrassed and humili- ated. Cifatte Dep. Tr. 180. Plaintiff Benton described Plain- tiff Cifatte as "crying hysterically, gasping for air like a child." Benton Dep. Tr. 93. Mr. Simpson's face was all red. Benton Dep. Tr. 189. Mr. Simpson followed Plaintiff Cifatte and stood over her chair. Cifatte Dep. Tr. 314. Plaintiff Cifatte could not get away from Mr. Simpson because he was standing behind her chair. Cifatte Dep. Tr. 314; Benton Dep. Tr. 275-76. Plaintiff Cifatte rolled her chair backwards, felt Mr. Simpson's feet and then stopped. Cifatte Dep. Tr. 330; Benton Dep. Tr. 276. Mr. Simpson stepped back, Cifatte Dep. Tr. 314, and said "Get in my office, we're taking this in my office. Get in

20

there." Cifatte Dep. Tr. 181. Plaintiff Benton told Plaintiff Cifatte not to go with Mr. Simpson, Benton Dep. Tr. 188, but Plaintiff Cifatte felt that she would lose her job if she didn't go, so she went. Cifatte Dep. Tr. 181. Once they were inside his office Mr. Simpson slammed the door. Cifatte Dep. Tr. 181. Plaintiff Benton was afraid that Mr. Simpson would hurt Plaintiff Cifatte, so she followed on the pretext of getting supplies. Benton Dep. Tr. 188-90. Through the office door Plaintiff Benton could hear Mr. Simpson screaming "I'm tired of this goddamn shit. I'm tired of hearing that you don't have a computer." Benton Dep. Tr. 188. Mr. Simpson told Plaintiff Cifatte: "You women are nothing but a cancer to me. You women make me sick, you disgust me. You women, I feel sorry for anyone who'd want to work with you." Mr. Simpson also said that he'd "had it" with the women. Cifatte Dep. Tr. 181. Plaintiff Cifatte was crying. Cifatte Dep. Tr. 190. Plaintiff Cifatte told Mr. Simpson that she didn't know what she'd done to deserve that; that her computer had been down for three weeks; that she had been telling his secretary for three weeks that her computer was down. Cifatte Dep. Tr. 181. At that point Plaintiff Cifatte just walked out. She could not stand the humiliation one more minute. She knew that there were

21

people on the other side of the door listening.  Cifatte Dep. Tr. 188.  Plaintiff Benton could hear Mr. Simpson screaming through the door.  Benton Dep. Tr. 68.  Mr. Simpson was screaming at the top of his lungs.  Cifatte Dep. Tr. 188.  Mr. Simpson was still screaming at her when she left.  Cifatte Dep. Tr. 189.  Plaintiff Cifatte went back to her work station after leaving Mr. Simpson's office.  She was sobbing uncontrollably.  Ms. Iaffaldano rubbed her back and said "Kim, go home, go home, you can't put up with this."  Cifatte Dep. Tr. 190; Cosentino Dep. Tr. 138.  Plaintiff Benton called Plaintiff Cifatte.  Plaintiff Cifatte was sobbing uncontrollably.  Cosentino Dep. Tr. 136.  Plaintiff Benton told Plaintiff Cifatte to go home.  Cifatte Dep. Tr. 315; Benton Dep. Tr. 191.  Plaintiff Cosentino also told Plaintiff Cifatte to go home.  Cifatte Dep. Tr. 316.  Plaintiff Cifatte had intended to stay, but she couldn't get control of herself, so she left, Cifatte Dep. Tr. 190-91, still crying.  Cosentino Dep. Tr. 140.  Plaintiff Cifatte had been telling Ms. Iaffaldano about her computer for weeks, Cifatte Dep. Tr. 183, 186, and had told Mr. Simpson himself once.  Cifatte Dep. Tr. 184.

    37.  Plaintiff Benton saw Mr. Simpson scream at Plaintiff Cifatte on Aug. 30, 2000.  Plaintiff Benton got so upset that she

had trouble breathing.  Plaintiff Benton had to take a Xanax and also use her inhaler.  Her heart was going a hundred miles an hour.  She had heart palpitations and she was shaking.  Benton Dep. Tr. 188, 289.  Plaintiff Benton said to herself "I'm getting sick.  I can't deal with this."  Benton Dep. Tr. 188.  Plaintiff Benton told Ms. Iaffaldano that she had to go home because she was getting sick.  Plaintiff Benton felt like she was going to vomit.  Benton Dep. Tr. 188.  Plaintiff Benton left work early and took the next day off.  Benton Dep. Tr. 67-68, 90, 92, 185, 188; Cosentino Dep. Tr. 127-28, 139.

38.  Although she did not witness it, Plaintiff Buonin-contra heard about the Aug. 30, 2000 incident and it made her concerned about her physical safety at work.  Buonincontra Dep. Tr. 142-43, 146-47.  Plaintiff Cosentino testified at deposition that although she wasn't usually afraid of physical abuse from Mr. Simpson, that day she was afraid.  Cosentino Dep. Tr. 127.

39.  There was a meeting attended by Ms. Stevens and Ms. Coleman at which Mr. Simpson apologized to Plaintiff Cifatte, and also to the other girls, for his actions.  Cifatte Dep. Tr. 193. Ms. Stevens spoke first and asked if this could be fixed. Cifatte Dep. Tr. 195-96.  Then Mr. Simpson said that he wanted to

apologize for his actions for the last few months and to Kim for his outburst. Cifatte Dep. Tr. 196. It was a pretty weak apology. Buonincontra Aff. ¶ 9. Ms. Stevens said now, lets everyone go downstairs and do our work. Cifatte Dep. Tr. 197. She used the phrase "put this to bed." Buonincontra Aff. ¶ 9. The women interpreted Ms. Stevens's remarks to mean that she didn't want to hear from them any more. Buonincontra Aff. ¶ 9.

40.    Plaintiff Buonincontra wasn't at work on Aug. 30, 2000 and missed the big blowup involving Kim Cifatte and Mr. Simpson. Later Mr. Simpson came to her and said that he had been instructed by Human Resources to apologize to all of the sales reps for his comment about shitting out another computer for Kim. Plaintiff Buonincontra waited for him to say more, but that was it. Mr. Simpson never expressed any regret for his conduct. His face, tone and voice showed complete lack of regret. He acted like he was carrying out an unpleasant duty. Buonincontra Aff. ¶ 6.

41.    In the early fall of 2000, shortly after the Aug. 30, 2000 blowup, Plaintiff Buonincontra met with Mr. Simpson in his office. When Plaintiff Buonincontra left Mr. Simpson ran after her down the hallway, calling to her to come back. When Plain-

24

tiff Buonincontra tried to open a second door to get to the other office, Mr. Simpson put his foot up against the door so she couldn't get away. Cifatte Dep. Tr. 201-02; Buonincontra Dep. Tr. 130-31. Enraged, Mr. Simpson put his face close to hers and screamed in Plaintiff Buonincontra's ear "Do you understand me? Do you understand me?" Plaintiff Buonincontra was very afraid of Mr. Simpson at that point. All she wanted to do was get away. Buonincontra Dep. Tr. 131. Plaintiff Buonincontra was crying when she told Plaintiff Cifatte what had happened. Cifatte Dep. Tr. 201. After that incident Plaintiff Buonincontra was very concerned about her physical safety in Mr. Simpson's presence. Buonincontra Dep. Tr. 142. Before then she was concerned that Mr. Simpson was erratic; after that she felt that he was a danger. Buonincontra Dep. Tr. 143-44.

42. Pitney Bowes had received complaints against Mr. Simpson before the female reps in the ECO room made them. Dawn Stevens told Plaintiff Buonincontra that there had been other complaints. Ms. Stevens held her fingers two inches apart and said that she had a file "this thick" on Mr. Simpson. Buonin-contra Aff. ¶ 8.

43.   The reps were frightened that Mr. Simpson would become
enraged and harm them.  Moore Dep. Tr. 230-31.  Mr. Simpson's
outbursts were becoming more frequent.  Benton Dep. Tr. 201.
The reps were afraid that Mr. Simpson was having problems and
maybe was going to lose it.  Benton Dep. Tr. 201.  Plaintiff
Moore contacted Doug Oakes of Corporate Integrity Affairs at
Pitney Bowes.  Moore Dep. Tr. 229-30.  One behalf of all the reps
in the room Plaintiff Moore asked Mr. Oakes for guards.  Moore
Dep. Tr. 231-32.  The request was honored.  Ms. Stevens told
Plaintiff Cifatte that the guards were coming.  Cifatte Dep. Tr.
238.  Two security guards were posted outside the room for a
couple of days.  Moore Dep. Tr. 232; Benton Dep. Tr. 201-03.
Plaintiff Moore wanted more protection but didn't get it.  Moore
Dep. Tr. 232.

44.   At a meeting Ms. Coleman let slip that Plaintiff
Buonincontra had spoken to Pitney Bowes corporate in Stamford.
This should not have happened because the call was confidential.
Ms. Coleman verbally attacked Plaintiff Buonincontra for calling
corporate, and Mr. Simpson echoed her, saying "You called corpo-
rate?"  Plaintiff Buonincontra replied that she had and that she
had let them know how the situation had been deteriorating and

26

what was happening in the ECO Department.  Buonincontra Dep. Tr.
148-51; Benton Dep. Tr. 70-74; Cifatte Dep. Tr. 203-04.  Within a
half an hour Plaintiff Buonincontra was summoned to Mr. Simpson's
office and subjected to a loud one and a half hour tirade.  Mr.
Simpson was enraged.  Plaintiff Benton was passing by Mr.
Simpson's office and from ten feet away could hear him screaming
at Plaintiff Buonincontra.  Benton Dep. Tr. 74-75.  Plaintiff
Buonincontra told Plaintiff Benton what had happened in Mr.
Simpson's office.  Buonincontra Dep. Tr. 76.  Plaintiff Buonin-
contra got very sick to her stomach and went to the bathroom.
Plaintiff Buonincontra ended up having to go home sick at 3:30 PM
that day.  Buonincontra Dep. Tr. 148-51, 157; Benton Dep. Tr.
74, 76-77.

45.    In the winter of 2000 Mr. Simpson became angry and
spoke to Plaintiff Cosentino in a loud voice for about five
minutes in the ECO Group area with the other reps there.  Cifatte
Dep. Tr. 284.  Plaintiff Cosentino got upset and was near tears.
Cifatte Dep. Tr. 285.

46.    At some point in 2000 Plaintiff Benton asked Mr.
Simpson a question about a business matter during a Monday
morning meeting.  Mr. Simpson snickered and in a loud and sarcas-

tic tone told her that she had Alzheimer's Disease.  Cifatte Dep.
Tr. 285-86; Moore Dep. Tr. 132.  The room got very quiet.
Plaintiff Benton just looked at him.  The meeting ended without
any more being said.  Benton Dep. Tr. 79-80.  Plaintiff Benton
got very upset.  Cifatte Dep. Tr. 287, 326.  This was another
occasion when Plaintiff Benton couldn't breathe and had to use
her inhaler.  Benton Dep. Tr. 78-80.

47.    Ms. Iaffaldano was always coming to Plaintiff Cifatte
and crying about Mr. Simpson because he had just berated or
belittled her.  Cifatte Dep. Tr. 287.  Plaintiff Benton saw Ms.
Iaffaldano hysterically crying at her desk.  Ms. Iaffaldano told
Plaintiff Benton that she was crying because of a statement that
Mr. Simpson had made.  Benton Dep. Tr. 99-1001.  Plaintiff Benton
told the other women in the department about Ms. Iaffaldano
hysterically crying for this reason.  Benton Dep. Tr. 101.

48.    Plaintiff Moore saw Mr. Simpson tease Ms. Iaffaldano
by singing out of his office "Oh Donna, Donna, my Prima Donna."
This made Ms. Iaffaldano angry because it looked like favoritism
towards Plaintiff Moore.  Moore Dep. Tr. 97.

49.    At a meeting in 2000 Mr. Simpson called the reps "you
fucking people."  Buonincontra Dep. Tr. 122.  Mr. Simpson used

obscenities quite often.  Buonincontra Dep. Tr. 267.  He used swear words when he was angry and upset.  Cosentino Dep. Tr. 116.

50.   Mr. Simpson told Plaintiff Moore more than once that Plaintiffs Benton, Buonincontra and Cifatte were "lazy."  Moore Dep. Tr. 79, 98.  At one point Mr. Simpson accused Plaintiff Moore of "collaborating" with the reps to avoid having to make sales calls herself.  Moore Dep. Tr. 188.

51.   Sometimes Mr. Simpson would insult the female reps at Monday morning meetings by giving a compliment that was actually an insult.  He'd say something like "Your sales weren't as bad as usual" or "not bad - for you."  Buonincontra Aff. ¶ 10.

52.   Plaintiff Moore saw Mr. Simpson talk down to the women in the ECO Group room, telling them that they didn't have what it took to be good sales reps, that they were inadequate.  Moore Dep. Tr. 97-98.  Mr. Simpson belittled the reps and tried to make them doubt themselves.  Moore Dep. Tr. 132.  His comments were relentlessly negative.  Buonincontra Dep. Tr. 214.  Plaintiff Moore felt that Mr. Simpson was manipulative, Moore Dep. Tr. 233, and that his refusal to clarify rules and put them in writing was part of his pattern of manipulative and vindictive behavior. Moore Aff. ¶ 3.  Plaintiff Buonincontra felt that Mr. Simpson pit

the people in the room against each other.  Buonincontra Dep. Tr. 103, 213.  Mr. Simpson wanted the reps not to speak to each other.  Buonincontra Dep. Tr. 190; Benton Dep. Tr. 140.

53.   On one occasion, when Plaintiff Benton thought that she had made her quota but Mr. Simpson had disallowed some of the sales, bringing her within one or one and a half points of quota, Mr. Simpson had Plaintiff Moore and Ms. Iaffaldano vote on whether to give Plaintiff Benton commission.  Plaintiff Moore thought that this was terrible; a sick mind game.  Benton Dep. Tr. 90-91, 285-86; Moore Dep. Tr. 169-70; Moore Aff. ¶ 2. Plaintiff Moore felt that it was more important to Mr. Simpson to exercise control over the women, and manipulate them, than to make sales.  Moore Dep. Tr. 260.

### Simpson's Pettiness, Lying & Dirty Tricks

54.   At one point when Plaintiff Buonincontra's sister worked in the same Pitney Bowes facility in Trumbull the sisters get word that their mother was very ill and had been taken to the hospital.  Plaintiff Buonincontra would explain the circumstances to Mr. Simpson and go to the hospital to be with her mother.  Mr. Simpson asked Plaintiff Buonincontra why she always had to be the one to leave work and suggested that she alternate going to the

hospital with her sister.  He said "Why do you always have to be the one to go?"  Plaintiff Buonincontra told him to leave her sister out of it.  These hospital visits costs Pitney Bowes nothing because Plaintiff Buonincontra used her own time and took unpaid FMLA time.  Buonincontra Dep. Tr. 100-02.

55.  On or about May 1, 2001, Plaintiff Moore sent Plaintiff Cifatte and Plaintiff Benton a memo saying that they could leave with only two days notice though as a rule two weeks notice of transfer to another division was required.  Cifatte Dep. Tr. 270-71 and Cifatte Dep. Ex. 20.  Mr. Simpson told Plaintiff Moore that Plaintiff Cifatte and Plaintiff Benton only had to give a two day notice on departure.  Moore Dep. Tr. 202.  The memo was written by Plaintiff Moore and edited by Mr. Simpson.  Moore Dep. Tr. 200.  Plaintiffs Benton and Cifatte were shocked when they were told that they could leave with only two days notice.  Moore Dep. Tr. 202.  It was unheard of.  Two weeks was customary. Moore Dep. Tr. 203; Benton Dep. Tr. 220.  They figured that they got it because Mr. Simpson wanted them out of there so bad. Moore Dep. Tr. 202.  Plaintiff Cifatte was insulted at being treated this way after nineteen years with the company.  Cifatte Dep. Tr. 272-73, 324.  Plaintiff Benton asked Plaintiff Moore why

the exception was being made.  She replied that Mr. Simpson
wanted the reps to leave the department, to be fired or leave on
their own.  Benton Dep. Tr. 221-23.

    56.  On or about Sept. 5, 2000 Mr. Simpson gave Plaintiff
Cifatte a memo accusing her of saying that he had had an inappro-
priate relationship with his secretary.  Cifatte Dep. Tr. 100-
102.  Plaintiff Cifatte had not made the statements recounted in
the memo.  Cifatte Dep. Tr. 101.  Plaintiff Cifatte threw the
memo back at Mr. Simpson.  She was upset because she had nothing
to do with claimed comments.  Cifatte Dep. Tr. 101-02, 105.  Mr.
Simpson told Plaintiff Cifatte that he had heard the comments
from Ms. Iaffaldano, who subsequently told Plaintiff Cifatte that
she had heard them from someone else who had heard them from
someone else.  Cifatte Dep. Tr. 102-03.  In reality the comments
about Mr. Simpson and Ms. Iaffaldano were innocuous.  At the end
of the month, when she was trying to get as many sales closed as
possible, Plaintiff Cosentino had a phone call.  Plaintiff
Cifatte was at her cubicle doing her work.  Plaintiff Cosentino
swivelled around in her chair and asked Plaintiff Cifatte if she
knew where Mr. Simpson was.  Plaintiff Cifatte said that she
didn't even know that he was missing.  Plaintiff Cosentino said

that she had a customer on the phone who wanted to close today and have a cartridge mailed out today, and for that she needed to have paperwork signed. Cifatte Dep. Tr. 103. Plaintiff Cosentino asked Plaintiff Cifatte to call Ms. Iaffaldano and ask her if they could sign the papers themselves. Cifatte Dep. Tr. 104. Plaintiff Cifatte called Ms. Iaffaldano, who was out to lunch. Plaintiff Cosentino then asked Plaintiff Cifatte to go next door to the lab and ask the people there if they had seen Ms. Iaffaldano. Cifatte Dep. Tr. 104. Plaintiff Cifatte went next door and asked. The people there said that Ms. Iaffaldano was out to lunch with Mr. Simpson. Plaintiff Cifatte reported what the lab people had said to Plaintiff Cosentino, who replied that it was no big deal. Plaintiff Cosentino said that she would fax the material to Mr. Simpson's fax machine, and when he came in he would sign it. Plaintiff Cosentino would stay to order the cartridge. Cifatte Dep. Tr. 104. Plaintiff Cifatte had nothing to do with any comments about an inappropriate relationship between Mr. Simpson and Ms. Iaffaldano. Cifatte Dep. Tr. 104-05. Plaintiff Cifatte never heard anyone in the ECO Group or the lab suggest that Mr. Simpson had an illicit relationship with Ms. Iaffaldano. Cifatte Dep. Tr. 311-12.

33

57.    On Aug. 31, 2000 Mr. Simpson sent the reps a memo on permissible break time.  Benton Dep. Tr. 179-81 and Benton Dep. Ex. 9.  On Sept. 14, 2000 Mr. Simpson sent a memo to the ECO Group reps cracking down on what purported to be excessive break time.  Cifatte Dep. Tr. 106-08; Benton Dep. Tr. 182-85 and Benton Dep. Tr. 10.  This was the first time that Mr. Simpson had ever expressed a concern about break time.  Cifatte Dep. Tr. 108; Buonincontra Dep. Tr. 211; Benton Dep. Tr. 181.  There was never a problem with it before.  Buonincontra Dep. Tr. 211.  Many of the women in the ECO room worked right through breaks; when this happened they got a little extra that afternoon or the following day.  Benton Dep. Tr. 181.  The language in Defendant Pitney Bowes's handbook relied upon by Mr. Simpson may have been there, but Plaintiff Cifatte had worked for Mr. Simpson for two years and this was the first time that she saw it put it into effect. Cifatte Dep. Tr. 108.  Plaintiff Buonincontra noticed that the people in the lab, who worked for Mr. Simpson too, took plenty of long breaks, including getting breakfast, and they didn't get this memo.  Buonincontra Dep. Tr. 211.

58.    Mr. Simpson sent Plaintiff Buonincontra a memo dated June 5, 2000 suggesting that she made fewer calls when he was

34

away from the office.  This was not true and Plaintiff Buonin-
contra objected to it.  Buonincontra Dep. Tr. 198-99, 203-04.

59.  Mr. Simpson had Plaintiff Moore send the Plaintiff
Cifatte and Plaintiff Benton a memo, dated May 1, 2001,  criti-
cizing them for eye rolling, heavy sighs and other allegedly
"unprofessional" behavior.  Cifatte Ex. 14 and Cifatte Dep. Tr.
220; Benton Dep. Tr. 25, 28 & Benton Dep. Tr. 16.  Plaintiff
Moore told Plaintiff Benton that Mr. Simpson had composed the
memo.  Benton Dep. Tr. 29.  One sentence read "You must learn to
deal with it or move on."  Plaintiff Benton felt that this
statement was a threat to her job.  Benton Dep. Tr. 28-29, 290-
91.  Plaintiff Benton found the memo very demeaning.  Benton Dep.
Tr. 28.  Plaintiff Benton found this memo deeply upsetting; she
experienced sharply elevated blood pressure and heart spasms when
she got it.  Benton Dep. Tr. 24-25, 27-31, 224-25 and Benton Dep.
Ex. 16.

60.  Whether someone made quota depended on Mr. Simpson's
whim.  Moore Dep. Tr. 148-49.  Mr. Simpson would say one thing
and then a day or two or three later it would be a different
thing.  Buonincontra Dep. Tr. 20.  His position constantly
changed.  Buonincontra Dep. Tr. 20.  Mr. Simpson would say

something and then say that he didn't say it.  Plaintiff Benton

would lie awake at night trying to figure it out.  Benton Dep.

Tr. 14-15.

61.  The reps complained to Plaintiff Moore that Mr.

Simpson would offer them increased points on certain bonus

accounts if they could close sales to those accounts by the end

of the month.  These were "three point accounts," large accounts

which had not ordered for some time and/or were hard to close.

Buonincontra Dep. Tr. 241-42, 289-90.  When the end of the month

came and points were tallied up, Mr. Simpson would say that he

never said that.  Moore Dep. Tr. 94; Cifatte Dep. Tr. 318;

Cosentino Dep. Tr. 165-66; Buonincontra Aff. ¶ 4.  Plaintiff

Cifatte perceived this conduct as harassment.  Cifatte Dep. Tr.

318.

62.  During the first three months she worked in the room

Plaintiff Moore noticed that Mr. Simpson would promise the group

additional points towards their quota if they could close certain

accounts, and then, when the points were tallied up, say "I never

said that."  Moore Dep. Tr. 95.  Plaintiff Moore watched Mr.

Simpson play the "I never said that" trick on Plaintiff Benton.

She heard him promise the points, she saw him deny Plaintiff

Benton the points, and she heard him deny that he had ever promised the points.  Plaintiff Moore confronted Mr. Simpson with this particular lie and he denied it.  Moore Dep. Tr. 113-15. Plaintiff Moore confronted Mr. Simpson about his lying to the reps on the three point accounts.  He got upset.  Moore Dep. Tr. 96.

63.    The reps were free to offer customers prices within a range but had to ask Mr. Simpson for permission to go lower than the range.  Cifatte Dep. Tr. 169-71; Buonincontra Dep. Tr. 275. They would meet with Mr. Simpson to get permission.  Buonincontra Dep. Tr. 275.  Mr. Simpson liked to do everything verbally and rarely wrote anything down.  Moore Dep. Tr. 115.  Much later, after Mr. Simpson had authorized the price and the sale had closed, he would say "Why did you give it to them for that?"  The rep would say that he had authorized the price.  Mr. Simpson would reply "I never said that." Buonincontra Dep. Tr. 275.

64.    Plaintiff Moore told Mr. Simpson what she had heard about the Aug. 30, 2000 incident in which Mr. Simpson blew up and screamed at Plaintiff Cifatte.  Mr. Simpson told Plaintiff Moore that he didn't raise his voice and that he had asked Plaintiff Cifatte in a normal voice to enter something in her computer.

Mr. Simpson said that it "wasn't a big deal" and that "everyone blew it out of proportion." Moore Dep. Tr. 174.

65.    Mr. Simpson accused Plaintiff Buonincontra of taking fourteen cigarette breaks in a day, which was ridiculous and untrue. Buonincontra Dep. Tr. 217-18.

66.    Mr. Simpson downplayed the conflicts in the department to an extreme degree during Plaintiff Moore's interview for the job. Moore Dep. Tr. 73. If it hadn't been for unexpected candor on the part of a HR interviewer Plaintiff Moore might have taken the job at the first interview. Moore Dep. Tr. 85. Mr. Simpson lied again during the second interview, downplaying everything and persuading Plaintiff Moore that the conflicts weren't that bad. Moore Dep. Tr. 86.

67.    Mr. Simpson wasn't forthright during Plaintiff Moore's training about how inaccurate and inadequate the database was. Moore Dep. Tr. 120. It took Plaintiff Moore three months at Pitney Bowes to grasp the "extreme problems" with the database. Moore Dep. Tr. 121.

68.    Plaintiff Benton went to Mr. Simpson in April, 2001 to review a discrepancy in her accounts. Plaintiff Benton thought that she had made quota for the month. Mr. Simpson said that she

38

had not.  Mr. Simpson had promised Plaintiff Benton extra points
if she closed approximately thirty-five accounts by a certain
deadline, verbally extended the deadline, and then denied that he
had done so.  Mr. Simpson had, however, written "Three points,
Gary Simpson" on little sticky notes and attached them to these
particular account file folders.  This showed that the sales to
these accounts counted for three points.  As a precaution Plain-
tiff Benton had taped those notes to the files so they could not
get lost.  When Mr. Simpson denied extending the time to make the
sales, Plaintiff Benton confronted him with the sticky notes and
said "No, Gary, you wrote it, here's your note."  Mr. Simpson
said "No, no, no."  Plaintiff Benton took the account folders
upstairs to Human Resources and explained to Mr. Simpson and Ms.
Coleman that she had made each sale.  Human Resources later told
Plaintiff Benton that she had made her commission for April.
Benton Dep. Tr. 86-89, 160-61, 232.

69.    A few days after she got the May 1, 2001 memo criti-
cizing her for negative attitudes, Plaintiff Benton showed the
memo to Mr. Simpson and told him that getting it put her in the
hospital.  Benton Dep. Tr. 24-25, 224-27 and Benton Dep. Ex. 16.
Mr. Simpson said that he knew nothing about it, Benton Dep. Tr.

226-27, but the memo had been written at Mr. Simpson's request.
Moore Dep. Tr. 148, 194, Moore Dep. Ex. 6, dated May 1, 2001;
Benton Dep. Tr. 229.  Plaintiff Moore understood that Mr. Simpson
wanted the memo as "documentation."  Moore Dep. Tr. 195.  The
sentence which called the memo a "formal warning" to Plaintiffs
Benton and Cifatte came from Mr. Simpson, not Plaintiff Moore.
Moore Dep. Tr. 196-97.  The sentence which said that Plaintiffs
Benton and Cifatte had ignored Plaintiff Moore's requests to
cease unprofessional conduct was Mr. Simpson's and was also
false; Plaintiffs Benton and Cifatte had not ignored Plaintiff
Moore's request.  Moore Dep. Tr. 197-98.

70.    Mr. Simpson told Plaintiff Moore that if she wanted
credit for a sale to the Swingster/American Identity account to
wait until Plaintiff Cifatte went home that night, create a new
account with the American Identity ID, and get rid of the Swing-
ster account.  Plaintiff Cifatte closed a sale to that  account
before the company changed names.  Cifatte Dep. Tr. 161.    Mr.
Simpson said that Plaintiff Cifatte "would never know."  Plain-
tiff Moore was surprised but did what Mr. Simpson said.  Moore
Dep. Tr. 130.  Plaintiff Moore later went to Ms. Iaffaldano's
desk and told her that she was entitled to credit for as sale to