a company named American Identity.  Ms. Iaffaldano said that the
original name of the account was Swingster and that it was
Plaintiff Cifatte's account.  Plaintiff Moore told Ms. Iaffaldano
that Mr. Simpson had told her that she could get credit for the
account because the name had changed.  Ms. Iaffaldano replied
"No, that's not right.  It's Kim's account.  Kim should get the
credit."  Plaintiff Moore replied "That's not what Gary said."
At this point Ms. Iaffaldano went to Human Resources and com-
plained that it was unfair for Plaintiff Moore to get the credit.
Moore Dep. Tr. 127-29.  Plaintiff Moore explained everything to
HR.  Moore Dep. Tr. 127.  Ms. Stevens and Ms. Coleman were
appalled.  Moore Dep. Tr. 131.  Ms. Stevens said "that she always
figured that there was something fishy about Gary; that there's
been way too many complaints about him, not just from us girls,
but from previous people." Moore Dep. Tr. 131.  Plaintiff Moore
got credit for Kim's Swingster sale anyway.  Cifatte Dep. Tr.
161.  When Ms. Stevens asked what had happened Plaintiff Moore
explained that she had done what Mr. Simpson told her to do.
Moore Dep. Tr. 131.  Plaintiff Benton heard of this incident from
both Plaintiff Moore and Ms. Iaffaldano.  It made her so upset
that she had to take a Xanax.  Benton Dep. Tr. 95-98.

41

71.    Plaintiff Cifatte wanted to transfer out of the ECO
Group but knew that it was going to be difficult with a "two"
rating.  Cifatte Dep. Tr. 163-65.  No manager would want to pick
up a problem employee with a "two" rating.  Cifatte Dep. Tr. 303.
When a manager sees that an employee trying to transfer has a two
rating, "you don't stand a chance, you go into the garbage pail."
Benton Dep. Tr. 158.  Plaintiff Cifatte was not able to transfer
out of the ECO Group.  None of the three divisions of Defendant
Pitney Bowes to which applied would hire her.  Cifatte Dep. Tr.
163-164.  Plaintiff Benton had to transfer out of the ECO room
because she couldn't stand it anymore.  Benton Dep. Tr. 217.
Plaintiff Benton applied for three or four positions within
Pitney Bowes but got no offers.  Benton Dep. Tr. 211-12.

## Simpson's Rigid, Unreasonable
## Behavior - Blaming the Victim

72.    Every month the reps battled with Mr. Simpson about
commissions.  Cifatte Dep. Tr. 159; Buonincontra Dep. Tr. 224;
Benton Dep. Tr. 51-53; Cifatte Dep. Tr. 160.  It might take
months of meetings to resolve a single issue.  Buonincontra Aff.
¶ 14.  Plaintiff Buonincontra had to fight over points being
taken away ninety percent of the time.  Buonincontra Dep. Tr.
225, 227.  "[I]t was always take away points for this, take away

42

points for that." Buonincontra Dep. Tr. 224. Mr. Simpson's list
wouldn't have closes which her list showed. Buonincontra Dep.
Tr. 227. Mr. Simpson had a variety of explanations for the
discrepancies. Buonincontra Dep. Tr. 228. It was a problem for
Plaintiff Buonincontra to work hard all month and then have to
fight about her points. Buonincontra Dep. Tr. 228. If Plaintiff
Cifatte's record didn't square with the official record she would
see Mr. Simpson, but she could not recall his ever changing her
commission as a result. Cifatte Dep. Tr. 160. Benton testified
at deposition that the monthly meeting with Mr. Simpson to
discuss commission statements was a major source of stress for
her and she would have to take a tranquilizer after she met with
him because she would get heart palpitations. Benton Dep. Tr.
51-53, 94, 290. Plaintiff Benton's computer printouts, which
were accurate, did not coincide with Mr. Simpson's records, which
were not. Benton Dep. Tr. 51, 160-61. Many times a data sheet
would not reflect a sale Plaintiff Benton had made and she would
have to go into Mr. Simpson's office and tell him. Benton Dep.
Tr. 52-53, 94. In a sadistic way Mr. Simpson say "You don't make
your commission." Benton Dep. Tr. 94. "I would make targets but
Mr. Simpson would not recognize that." Benton Dep. Tr. 161. Mr.

43

Simpson never changed the record.  Benton Dep. Tr. 53.  Fighting
with Mr. Simpson over calls, quota and commission not only upset
the reps, and diminished their incomes, but cut into their time
to make phone calls and close sales and impaired their concentra-
tion.  Mr. Simpson's behavior thus helped create the poor perfor-
mance he relied upon as his excuse for torturing the reps.  Moore
Aff. ¶ 4.  The terrible environment in the ECO room affected the
reps and caused production to decline.  Buonincontra Dep. Tr.
244.

73.  Most of the bonus levels set by Mr. Simpson for the
ECO Group had never been made in the history of the Group.  If
they had been made, it was long ago, before the database had been
fished out.  Moore Dep. Tr. 189-90.

74.  Sometime in 2000 the reps met with Mr. Simpson to
discuss proposals to restructure the commission program due to
the well-known problems with the database.  Buonincontra Dep. Tr.
119-20.  Mr. Simpson got angry, said "What do you fucking people
want from me?" and abruptly left the room.  The reps were devas-
tated by this reaction.  Buonincontra Dep. Tr. 121-22; Cosentino
Dep. Tr. 117.  Plaintiff Benton and Plaintiff Cifatte were
shocked that a manager would talk down to them like that.

Cosentino Dep. Tr. 119-20.  Mr. Simpson refused to make any

changes in the program.  Buonincontra Dep. Tr. 121-22.  Mr.

Simpson got upset with  Plaintiff Cosentino when she brought it

up.  Cosentino Dep. Tr. 123.

75.    At one Monday morning meeting, when the reps were

talking about the commission structure, Mr. Simpson learned back

in his chair and said "God damn, why do you keep doing this to

me?"  Cosentino Dep. Tr. 122.  Mr. Simpson said that we've gone

over it before and it's not going to change; "it is what it is."

Cosentino Dep. Tr. 122.

76.    Plaintiff Buonincontra asked if there was anything

that could be done about the size of the room in Trumbull.  She

did not pursue the issue because the response was this is the

size of the room and that's it.  Buonincontra Dep. Tr. 81.

Plaintiff Buonincontra asked Mr. Simpson if she could move nearer

his office where it was quieter.  Mr. Simpson refused without any

explanation other than he wanted everyone together.  Buonincontra

Dep. Tr. 82-83.

77.    Mr. Simpson asked Plaintiff Moore to look into why the

reps were making so few phone calls.  Moore Dep. Tr. 214.

Plaintiff Moore had serious questions about Mr. Simpson's claim

that the reps were not making phone calls because she could hear them making the calls. The IS Department phone activity print-outs seemed not to match what the reps were writing down and the contacts that had taken place. Moore Dep. Tr. 212-13. Plaintiff Moore cross checked the IS Department printouts against the reps written sheets and found that the reps were making many more calls that they were being given credit for. Moore Dep. Tr. 213. Plaintiff Moore reported her findings to Mr. Simpson. He said nothing. Moore Dep. Tr. 213. Months later Pitney Bowes hired a telecommunications expert who told Plaintiff Moore that the phone system was very antiquated and that the system came nowhere near giving an accurate picture of the calls that the reps were making. Moore Dep. Tr. 215-26. This was confirmed in a memo. Moore Dep. Tr. 216. Mr. Simpson was well aware, even before the memo, that the phone system was very antiquated, so the idea that it was not recording all of the calls should have come as no surprise to him. Moore Dep. Tr. 218. Furthermore, since the approximate number of calls needed to do a given volume of business was well known in the ECO room, Mr. Simpson could not possibly have believed that the reps were generating so many closes with so few calls. Buonincontra Aff. ¶ 12-13.

46

78.    Mr. Simpson denied that there were any problems with the database. He said "It is what it is." Moore Dep. Tr. 122-23; Buonincontra Dep. Tr. 124-25. Plaintiff Moore was afraid to discuss the issue with Mr. Simpson because he was so adamant about not making changes. Moore Dep. Tr. 123. The second time Plaintiff Moore brought up the subject Mr. Simpson said that she was beginning to sound "just like them," meaning the reps. Moore Dep. Tr. 123.

79.    At the end of May, 2001, at the request of the reps, Plaintiff Moore gathered her courage and went to Mr. Simpson and asked for changes to lighten their load based on the problems with the database. At first Mr. Simpson said that he would lower the quota to twenty sales a month. Then he laughed and said "No, that's not true." He refused to make any concessions and went on to make an offensive remark about Plaintiff Moore "straddling the fence." Moore Dep. Tr. 124-25.

80.    Plaintiff Moore actively tried to improve the computer system used by the reps. Mr. Stevens participated in a meeting with IS people to see if her suggestions could be implemented but he did not support them. Mr. Simpson acted like he didn't care one way or another. Moore Dep. Tr. 222-25.

81.  On or about Dec. 6, 2000 Plaintiff Cifatte met with
Mr. Simpson to discuss her 1999-2000 annual review.  Cifatte Dep.
Tr. 117-18, 121.  Plaintiff Cifatte does not recall exactly what
was said, but she is sure that there was a fight.  "It was always
a fight."  Cifatte Dep. Tr. 119.  Mr. Simpson gave Plaintiff
Cifatte a "two" review, meaning "meets most expectations."
Cifatte Dep. Tr. 125.  Plaintiff Cifatte thought that it should
have been a "three" review, "fully meets requirements."  Cifatte
Dep. Tr. 125-26; Benton Dep. Tr. 159.  A "two" review was a bad
rating.  Cifatte Dep. Tr. 166; Benton Dep. Tr. 157-58.  You can't
get a raise with a two rating.  Benton Dep. Tr. 159-60.  Dawn
Stevens of Human Resources told Plaintiff Cifatte that a "two"
review did not look good.  Cifatte Dep. Tr. 166.  Plaintiff
Cifatte thought that she was being "framed" by Mr. Simpson.
Cifatte Dep. Tr. 166.  Mr. Simpson stated in the 1999-2000 review
that Plaintiff Cifatte's performance was poor because she did not
make enough calls.  Plaintiff Cifatte told Mr. Simpson that there
was something wrong with the computer which kept track of the
calls because she made more calls than fifty every day.  Cifatte
Dep. Tr. 127-28.  Plaintiff Cifatte felt that the review was
unfair, and an inaccurate portrayal of her performance during the

48

review period, and told Mr. Simpson so.  Cifatte Dep. Tr. 120.

Mr. Simpson was inflexible.  Cifatte Dep. Tr. 120.  Plaintiff

Cifatte testified "It was a no-win situation."

82.   Plaintiff Cifatte complained to Human Resources that

the review was unfair.  Ms. Stevens pressured her into signing it

anyway.  Cifatte Dep. Tr. 121-24.

83.   Mr. Simpson met with Plaintiff Benton to discuss her

1999-2000 annual review.  Benton Dep. Tr. 155, 168 and Benton

Dep. Ex. 6.  Mr. Simpson told Plaintiff Benton that he was giving

her a "two" review - "meets most requirements."  Plaintiff Benton

replied that she had never gotten a two rating in her career with

Pitney Bowes and she knew that every woman in the ECO Department

had gotten a "two" rating.  Benton Dep. Tr. 155-57, 159.  Plain-

tiff Benton told Mr. Simpson that she couldn't transfer with a

"two" rating.  Benton Dep. Tr. 158.  Plaintiff Benton said that

she was very unhappy that there was nothing positive in the

review.  Benton Dep. Tr. 166, 168.  Later, after Plaintiff Benton

complained, Pitney Bowes Human Resources made Mr. Simpson give

Plaintiff Benton a slightly revised review.  Benton Dep. Tr. 154,

156-57, 166-69.

84.    When she got the "two" review Plaintiff Benton did her own calculations and determined that Mr. Simpson had not counted approximately $15,000 in revenue she had earned during a nine month period in 2000.  Benton Dep. Tr. 162-63.  She sent Mr. Simpson a memo with her calculations.  Benton Dep. Tr. 173-75 and Benton Dep. Tr. 7.  Plaintiff Benton then sat down with Mr. Simpson and showed him that according to all of the records his calculations were wrong.  Benton Dep. Tr. 162-65.  He replied "Not by my figures they're not."  Benton Dep. Tr. 165.  Mr. Simpson still insisted that his figures were accurate.  Benton Dep. Tr. 170.  Plaintiff Benton felt that the review was not fair.  Benton Dep. Tr. 172.  The 2000-2001 review, prepared by Plaintiff Moore, was fair and Plaintiff Benton accepted the suggestions it contained.  Benton Dep. Tr. 204-06.

85.    It was easier to work in the room after Plaintiff Moore was hired because the reps didn't have to deal with Mr. Simpson one on one.  They could talk to Plaintiff Moore, who would go to Mr. Simpson and bring his replies back to the reps. Mr. Simpson would still deny having made statements about ac- counts, but at least the reps did not have to speak to Mr. Simpson.  Benton Dep. Tr. 208-09.  Plaintiff Moore could see that

50

the reps weren't goofing off and that they were doing what they were supposed to do. She could see what the reps had to deal with. Benton Dep. Tr. 208.

86. Mr. Simpson said the same things over and over when talking to the reps. This was harassment. Cifatte Dep. Tr. 317-18. Plaintiff Buonincontra testified at deposition that Mr. Simpson said the same things to her over and over again; "it just seemed like it went on forever." Buonincontra Dep. Tr. 130.

87. Mr. Simpson gave Plaintiff Buonincontra a "two" review for 1999-2000. Plaintiff Buonincontra told him that she was very unhappy with the review and asked him where she was going to go, where she was going to get a job, with this review. Buonincontra Dep. Tr. 220-21. Plaintiff Buonincontra told Mr. Simpson "You're tying my hands." Buonincontra Dep. Tr. 220. Mr. Simpson did not answer. Buonincontra Dep. Tr. 221. Mr. Simpson knew that Plaintiff Buonincontra was actively looking for a job, because she had told him so, but she had also told him that she didn't intend to take just any old job to get out of the Department. Buonincontra Dep. Tr. 221-222. According to Pitney Bowes this was a very important review because a hiring manager was going to

51

look at it and if he sees a "two" review he isn't going to hire you.  Buonincontra Dep. Tr. 221.

88.    Mr. Simpson gave Plaintiff Buonincontra an EPD and threatened to terminate her in three months.  Buonincontra Dep. Tr. 223.  An EPD is the last step before termination.  You have to make drastic changes or you will be terminated.  Buonincontra Dep. Tr. 273.  Any verbal or written warning will result in termination.  Benton Dep. Tr. 251.  Plaintiff Moore told the reps in a meeting in February, 2001, shortly after she arrived in the department, that Mr. Simpson was going to start issuing verbal warnings that led to EPDs that led to termination.  Benton Dep. Tr. at 299.

89.    Plaintiff Moore told Plaintiff Cifatte that had not wanted to write the memo accusing Plaintiff Cifatte and Plaintiff Benton of negative attitudes, Cifatte Dep. Ex. 14, dated May 1, 2001, or even to give it to them, Cifatte Dep. Tr. 220, because it was stupid and inaccurate, but Mr. Simpson had told her to "get them out," meaning the female reps.  Mr. Simpson, Plaintiff Moore told Plaintiff Cifatte, told her "I don't care what you have to do, get them out." Cifatte Dep. Tr. 220.  Plaintiff Moore outlined the memo and Mr. Simpson edited it.  Moore Dep. Tr. 194.

Plaintiff Moore understood that Mr. Simpson wanted the memo as
documentation.  Moore Dep. Tr. 195.  That portion of the May 1,
2001 memo which called it a "formal warning" to Plaintiffs Benton
and Cifatte came from Mr. Simpson, not Plaintiff Moore.  Moore
Dep. Tr. 196-97.  The sentence which said that Plaintiffs Benton
and Cifatte had ignored Plaintiff Moore's requests to unprofes-
sional conduct was Mr. Simpson's as well; Plaintiffs Benton and
Cifatte had not ignored Plaintiff Moore's request.  Moore Dep.
Tr. 197-98.

90.   There was a meeting lasting approximately twenty
minutes between Mr. Simpson, Plaintiff Cifatte and Plaintiff
Moore on March 9, 2001, the day after Plaintiff Cifatte handed
her March 8, 2001 letter to Mr. Simpson.  During that meeting
Mr. Simpson handed Plaintiff Cifatte a two page memo criticizing
alleged performance deficiencies.  Cifatte Dep. Tr. 247-49, 251
and Cifatte Dep. Ex. 17.  Plaintiff Cifatte did not waste much
time telling Mr. Simpson why she could not reach her performance
targets; the reasons for missing the targets had not changed, Mr.
Simpson would always come up with more reasons why it was her
fault, and it was clear by that time that Plaintiff Cifatte was
on her way out of the company.  Cifatte Dep. Tr. 251, 254.

Plaintiff Cifatte remembers saying to Mr. Simpson do you know how much added pressure I am going to have now that I have been written up?  Cifatte Dep. Tr. 251.

91.   On April 6, 2001, Mr. Simpson gave Plaintiff Cifatte her formal EPD.  Cifatte Dep. Tr. 262 and Cifatte Dep. Ex. 19. Mr. Simpson told Plaintiff Cifatte that she would be terminated if she failed to satisfy the standards.  Cifatte Dep. Tr. 264. The program devised by Mr. Simpson for Plaintiff Cifatte was pure harassment.  It did not increase productivity, Cifatte Dep. Tr. 267, but it did increase Plaintiff Cifatte's workload.  She had to write down how many phone calls she did in a day, who she spoke to and what they said, and then sit down with Plaintiff Moore during the last thirty minutes of the day and retail fifty conversations.  Cifatte Dep. Tr. 217-18, 266.  Plaintiff Cifatte stuck with the program for nine months, Cifatte Dep. Tr. 253, although she was already on track and did not need any incentive to perform.  Cifatte Dep. Tr. 267.

### Direct Evidence of Intent to Injure Plaintiffs

92.   Either during her second job interview, or shortly after Plaintiff Moore was hired, Mr. Simpson told her that if the conflicts in the ECO Group room were not resolved "we would get

rid of them."  Moore Dep. Tr. 86.  This meant Plaintiffs Benton, Buonincontra and Cifatte because they were the reps in the ECO Group room at that time.  Moore Dep. Tr. 92.

93.  Very soon after Plaintiff Moore started work she had a conversation with Mr. Simpson in his office in which he said that he felt that "we", meaning he and Plaintiff Moore, needed to make a clean slate and get rid of them.  Plaintiff Moore asked Mr. Simpson his plan to get rid of them.  Mr. Simpson replied that he was working on EPDs, disciplinary action to try to terminate them, and that if they got miserable enough maybe they would leave.  Moore Dep. Tr. 89, 90.  Mr. Simpson said that because Plaintiff Moore was so new he would handle the EPDs himself.  Moore Dep. Tr. 90.

### Evidence That Simpson's Conduct Towards the Plaintiffs Was Because of Their Sex

94.  Mr. Simpson told Plaintiff Moore more than once after she started work at Pitney Bowes that the women in the ECO Group room were "cancer."  Moore Dep. Tr. 97-98.  Plaintiff Moore did not feel that these were ways of discussing a business problem.  She felt that they were personal attacks.  Moore Dep. Tr. 98.

95.  Before Plaintiff Moore realized what the reps had to deal with, i.e., during the first three months that she was at

55

Pitney Bowes, she met with Ms. Coleman and Mr. Simpson in Ms. Coleman's office.  Mr. Simpson said "These women are like a cancer.  They're just poison."  Moore Dep. Tr. 145-46.

96.    During the conversation in Mr. Simpson's office in which he revealed to Plaintiff Moore his plan to get rid of the other Plaintiffs through EPDs, Mr. Simpson said that "the women" were like a cancer to him, that they were poison, and that they fed off each other.

97.    Mr. Simpson called Plaintiff Cosentino into his office the afternoon of Aug. 30, 2000 and said "What am I going to do?  What am I going to do with you?"  He wasn't yelling.  Instead he had a smirk on his face, like he was enjoying what he was saying.  Cosentino Dep. Tr. 132-33.  Mr. Simpson told Plaintiff Cosentino "You women are all a cancer.  You disgust me.  I'm embarrassed to have anybody know that you work for me.  You're all made from the same fiber."  Mr. Simpson kept repeating "You are all a cancer" as if he was getting pleasure out of saying it, out of seeing Plaintiff Cosentino squirm.  Cosentino Dep. Tr. 128, 132.  Plaintiff Cosentino told Mr. Simpson that he had offended her.  Plaintiff Cosentino's father had been diagnosed with cancer a few months before.  Cosentino Dep. Tr. 128.  The diagnosis made

Plaintiff Cosentino very, very upset. "I just didn't like being referred to as a cancer. I had never heard that terminology before, you are a cancer, you women." Cosentino Dep. Tr. 128-29. Mr. Simpson did not respond to what Plaintiff Cosentino said but continued on about how the women were an embarrassment and that he was embarrassed to have anybody in the building know that they worked for him. Cosentino Dep. Tr. 129. Plaintiff Cosentino asked "Why just me?" because she felt that this tirade was a personal attack on her by Mr. Simpson. Mr. Simpson replied "Don't you worry, I'll get the rest of them on Monday." At that time Plaintiff Benton had gone home and Plaintiff Buonincontra wasn't in the office. Cosentino Dep. Tr. 129-30.

98. Mr. Simpson said "You women are like a cancer" and "You make me sick to my stomach" to Plaintiff Buonincontra in a meeting with her in his office. He said it in a negative, derogatory and nasty way. Plaintiff Buonincontra was very offended. Her mother had passed away from cancer, and Mr. Simpson knew that. Plaintiff Buonincontra told Mr. Simpson that she was offended. His response was that it was a common phrase that people use every day. Plaintiff Buonincontra said that she had never heard it, and Mr. Simpson said "Well, then maybe you

57

should get out more often." Buonincontra Dep. Tr. 133-34.

Plaintiff Buonincontra understood the "cancer" remark to show sex

discrimination: "[Y]ou women make me sick is not you women and

men, it's you women." Buonincontra Dep. Tr. 259.

99.    Mr. Simpson made the "cancer" remark to the female

reps at a Monday morning meeting in 2000. Buonincontra Dep. Tr.

134. Mr. Simpson banged on the table and said "You women are

like a cancer, I feel sorry for anybody that has to work with

you." Buonincontra Dep. Tr. 296; Benton Dep. Tr. 82-84, 272.

The reps - Plaintiff Benton, Plaintiff Buonincontra, Plaintiff

Cosentino and Plaintiff Cifatte - were appalled. Benton Dep. Tr.

85. They had a group discussion. Benton Dep. Tr. 85. Plaintiff

Buonincontra was very upset because her mother was ill with

cancer. Plaintiff Cosentino's father was diagnosed with cancer

as well. Benton Dep. Tr. 85-86. The group was very upset about

what Mr. Simpson had said. Benton Dep. Tr. 86.

100.    Plaintiff Benton understood Mr. Simpson's statements

"You women are a cancer" and "You women make me sick" to be

denigrating to women. Benton Dep. Tr. 382. The remarks did not

refer to "you women" just because at the time all of the reps

were female, since Mr. Simpson made the remarks when Darryl

Schneider worked in the room and he was not female.  Benton Dep. Tr. 282.

101.    Mr. Simpson asked the female reps "Can't you girls do anything right?"  Benton Dep. Tr. 272-73.  This statement was made at Monday morning meetings and in the ECO room.  Benton Dep. Tr. 273.

102.    Plaintiff Buonincontra told Mr. Simpson that his personality had changed when the ECO Group moved from Shelton to Trumbull.  He said "maybe [the change was] because I'm on the same floor as you women now."  Buonincontra Dep. Tr. 105.

103.    At one point Plaintiff Buonincontra asked Mr. Simpson why Darryl got to go to sporting events with Mr. Simpson, or got tickets from Mr. Simpson, and Mr. Simpson replied "you women" don't like baseball.  Buonincontra Dep. Tr. 263.

104.    Department employees had lunch at Stella's Restaurant in the early spring of 2000.  In the presence of Plaintiff Cifatte, Plaintiff Buonincontra, Plaintiff Benton and Darryl Schneider, Mr. Simpson said that women were made to stay home and take care of their children and cook for their husbands.  Cifatte Dep. Tr. 291; Plaintiff Buonincontra Dep. Tr. 259.  Plaintiff Buonincontra thinks that the remark was directed to Plaintiff

Cifatte, who has children; Plaintiff Cifatte's face changed when she heard the remark and it was clear that she found it offensive.  Plaintiff Buonincontra Dep. 260-61.  Plaintiff Cifatte, Plaintiff Buonincontra and Plaintiff Benton discussed Mr. Simpson's statement when they got back to the office.  They felt that it was a bigoted remark.  Cifatte Dep. Tr. 292.

105.  If Darryl's numbers were down Mr. Simpson would say to him at a Monday morning meeting "Well jeez Darryl, you're gonna let the girls beat you."  Plaintiff Buonincontra felt that this remark showed sex discrimination against the female reps. Buonincontra Dep. Tr. 259.  Mr. Simpson would say that Darryl was "supposed to be a man" and goading him by saying "you're going to let the women beat you."  Buonincontra Dep. Tr. 213.

106.  One day Plaintiff Cifatte was in Mr. Simpson's office sitting in a chair.  Mr. Simpson sat right next to her.  He infringed on her space.  He moved into Plaintiff Cifatte.  She could feel his body weight on her.  She could not move away from Mr. Simpson because there was too little space between her and the desk and Mr. Simpson was in the way.  Plaintiff Cifatte was very upset.  She could not keep her mind on the work.  She was ready to explode.  At that point Ms. Iaffaldano walked by and

said "Gar, aren't you getting a little too comfortable?"  Mr.
Simpson got up and moved away.  Cifatte Dep. Tr. 294-96.

107.    Plaintiff Cifatte would hand Mr. Simpson a folder.
When she pointed something out to him with a finger, Mr. Simpson
would put his hand on top of hers and rub her finger with his
finger.  Cifatte Dep. Tr. 319.  Plaintiff Cifatte felt disgust at
this conduct by Mr. Simpson.  Cifatte Dep. Tr. 320.

108.    Plaintiff Moore went to Mr. Simpson's office to show
him an account file.  Plaintiff Moore was standing up facing Mr.
Simpson's desk.  Mr. Simpson said that he thought that it sounded
familiar, like it could have been one of his accounts, and jumped
up to look in the file drawers opposite his desk.  Mr. Simpson
rubbed his behind up against Plaintiff Moore's behind and left it
there.  Plaintiff Moore was very uncomfortable.  Plaintiff Moore
immediately scooted to the side.  Mr. Simpson never apologized
for this incident.  Moore Dep. Tr. 133.  Plaintiff Moore felt
that Mr. Simpson was trying to intimidate her.  Moore Dep. Tr.
233.  Plaintiff Moore told HR about this incident. Moore Dep. Tr.
133.

109.    Mr. Simpson frequently wore short sleeved shirts in
the summer.  He would cozy up to the female employees while he

was reading an account folder.  He rubbed his arm up against Plaintiff Moore.  Plaintiff Moore testified at her deposition that he did this "to intimidate us."  Moore Dep. Tr. 133, 233.

110.   Mr. Simpson said to Plaintiff Moore during a meeting in May, 2001 that she was straddling the fence, that she had one leg on each side, that that was a very uncomfortable place to be, that she was going to be very sore, and that she might even need to take a hot bath that night.  Moore Dep. Tr. 96. Plaintiff Moore thought that this remark had a "very sexual connotation" and was also a threat of termination.  Moore Dep. Tr. 173, 247.

111.   Mr. Simpson referred to attractive women as "normal." He refused to hire "not normal," or unattractive, women.  It was part of Plaintiff Moore's job to interview candidates for the ECO Department.  Moore Dep. Tr. 186.  Four or five very experienced and qualified candidates Plaintiff Moore submitted to Mr. Simpson were rejected because they were not attractive enough.  Mr. Simpson said "Donna, I only want normal people."  Mr. Simpson rejected an overweight women, highly recommended by Plaintiff Moore and HR, saying "No, she would never be able to get her body out of the chair."  Moore Dep. Tr. 100-02.  Plaintiff Moore fought to get Sharon Post, who was not attractive, hired.  Mr.

Simpson refused, saying that she was "left of normal."  Moore

Dep. Tr. 103-04.

   112.    There was a distinct difference in the way Mr.

Simpson treated Darryl Schneider, the male rep, and the way he

treated the female reps.  Buonincontra Dep. Tr. 108, 261.  Mr.

Simpson was friendly with Darryl.  Cifatte Dep. Tr. 216  Mr.

Simpson had a rapport with Darryl, not like his relationship with

the female reps.  Buonincontra Dep. Tr. 108, 262; Benton Dep. Tr.

135.  Mr. Simpson was very nice to Darryl.  Benton Dep. Tr. 200.

At times Mr. Simpson would take Darryl to lunch; just Darryl, not

the reps as a group.  The other reps only went out with Mr.

Simpson as a group.  Benton Dep. Tr. 264.  Mr. Simpson would come

in the ECO room and discuss sports with Darryl.  Benton Dep. Tr.

135.  Mr. Simpson would walk in the room and see Darryl with an

open newspaper, checking sports scores, or making a personal

call, and say nothing about it.  Buonincontra Aff., ¶ 2.

   113.    Mr. Simpson told the reps not to come up to his

office to see him but to call instead.  Cosentino Dep. Tr. 105.

Darryl would go up to Mr. Simpson's office on business and then

stay to talk sports.  Cosentino Dep. Tr. 99-102.  The female reps

did not go up to Mr. Simpson's office to talk because they had

been told to call instead. Cosentino Dep. Tr. 106-07. Darryl was always in Mr. Simpson's office talking about sports. Cifatte Dep. Tr. 278; Benton Dep. Tr. 136, 265. They spent a lot of time talking about sports. Buonincontra Dep. Tr. 108, 262. A couple of times a week Darryl would spend a prolonged period, about an hour, in Mr. Simpson's office, talking sports. Buonincontra Dep. Tr. 109; Benton Dep. Tr. 265; Cosentino Dep. Tr. 101-02. Plaintiff Benton saw this happen, Benton Dep. Tr. 265, as did Plaintiff Cosentino. Cosentino Dep. Tr. 98-101. The other reps didn't talk sports with Mr. Simpson. Cosentino Dep. Tr. 109.

114.    Darryl went to sports events with Mr. Simpson, including Bluefish baseball games and Masuk High School games. Cifatte Dep. Tr. 278, 282; Buonincontra Dep. Tr. 263; Benton Dep. Tr. 263-64; Buonincontra Aff. ¶ 15. Mr. Simpson got tickets. Benton Dep. Tr. 263. Plaintiffs Benton, Buonincontra and Cifatte saw Mr. Simpson and Darryl chat about a sports event which they had attended together. Buonincontra Aff. ¶ 15. Mr. Simpson gave Darryl tickets to see the Bluefish. Buonincontra Dep. 263. Mr. Simpson never invited any of the female reps to go to any games with him. Cifatte Dep. Tr. 282; Buonincontra Dep. Tr. 263. At one point Plaintiff Buonincontra asked Mr. Simpson why Darryl

gets to go to the games or gets tickets and Mr. Simpson replied "you women" don't like baseball. Buonincontra Dep. Tr. 263. Plaintiff Buonincontra thought to herself "How would he know if they didn't like baseball?" Buonincontra Dep. Tr. 263. Darryl sold football slips. Buonincontra Dep. Tr. 284-85. Mr. Simpson bought sports bets from Darryl though it was not allowed at Pitney Bowes. Cifatte Dep. Tr. 278; Benton Dep. Tr. 265; Buonincontra Aff. ¶ 16.

115. Mr. Simpson considered Darryl an ace employee, Cifatte Dep. Tr. 279, and referred to him as his "poster child." Buonincontra Dep. Tr. 108; Benton Dep. Tr. 135-36. Mr. Simpson didn't refer to Darryl as a source of frustration. Buonincontra Dep. Tr. 110. Mr. Simpson was frustrated with the female reps, not Darryl. Buonincontra Dep. Tr. 111. At the Monday morning meetings Mr. Simpson frequently singled out Darryl for praise. Cosentino Dep. Tr. 176-77. Mr. Simpson acted like Darryl had done everything right and the female reps had done everything wrong. Cifatte Dep. Tr. 325. Mr. Simpson praised Darryl's chatty sales technique though it in fact reduced the number of calls he made. Cosentino Dep. Tr. 178-79. There was no yelling at Darryl. Buonincontra Dep. Tr. 109. Mr. Simpson would bring

65

up the closes of each individual female rep during the Monday morning meetings, and embarrass and humiliate each one in turn, but when he got to Darryl, even if Darryl's closes were the lowest of all, Mr. Simpson would be gentle with him, Benton Dep. Tr. 278, and use a joking tone. Buonincontra Dep. Tr. 283-84. When Darryl made quota Mr. Simpson got all excited and made a big deal out of it, with favorable comments, but when the female reps made quota nothing was said. Cifatte Dep. Tr. 325; Benton Dep. Tr. 279. Mr. Simpson didn't compliment any rep at the Monday morning meetings other than Darryl. Cifatte Dep. Tr. 278, 283. Mr. Simpson did not manipulate sales goals, alter business records and reduce commission payments to hurt Darryl. Benton Dep. Tr. 285. When there was a dispute over an account Mr. Simpson gave Darryl the sale so that he could make quota. Buonincontra Aff. ¶ 3.

116.    Mr. Simpson's favorable treatment of Mr. Schneider did not make sense from a business perspective because Darryl was not in fact an ace employee. Cifatte Dep. Tr. 279. Darryl was on the phone with dating services and girlfriends while the female reps were working and only started to make business calls at about three o'clock. Cifatte Dep. Tr. 279; Benton Dep. Tr.

66

136; Buonincontra Aff. ¶ 2.  The reps could all see Darryl's
numbers at the Monday morning meetings, Buonincontra Dep. Tr.
282-83, and his productivity was no better than that of the other
reps.  Cifatte Dep. Tr. 280.  Plaintiff Cosentino paid particular
attention to Darryl's numbers,  Cosentino Dep. Tr. 173, and she
found them to rank a little under Plaintiff Buonincontra's
numbers.  Cosentino Dep. Tr. 175.  Darryl told Plaintiff Benton
that he was concerned because he couldn't seem to make his
targets and was disgusted because he just couldn't seem to get
anywhere.  Benton Dep. Tr. 133-35.  Plaintiff Benton could see
that more often than not Darryl didn't make his targets.  Benton
Dep. Tr. 134, 200.  Mr. Simpson held up Darryl as an example to
the female reps, not Plaintiff Cosentino, though Plaintiff
Cosentino very consistently achieved her quota and was a better
rep than Darryl.  Buonincontra Dep. Tr. 112-13; Benton Dep. Tr.
138-39.

117.    Towards the end it was clear that Darryl didn't care
about his job.  Cosentino Dep. Tr. 174.  His phone calls, sales
and closed calls against quota all declined over time.  Cosentino
Dep. Tr. 174-75.  Darryl eventually found another job.  Either
Mr. Simpson or Mike Armstrong offered Mr. Simpson a $3,000 raise

to stay.  Darryl showed the female reps in the ECO Group the written proposal.  Plaintiff Benton saw the proposal.  Benton Dep. Tr. 136-37.  Plaintiff Buonincontra saw the proposal. Buonincontra Aff. ¶ 11.  The only time Plaintiff Benton ever saw Mr. Simpson angry at Darryl was when he left Pitney Bowes, Benton Dep. Tr. 277, and that was for telling the female reps about his offer.  Buonincontra Aff. ¶ 11.

118.  Mr. Simpson thought that a male rep named John Connor was going to do a really great job and be successful.  Moore Dep. Tr. 99.  Mr. Simpson was cordial and polite to Mr. O'Connor. Benton Dep. Tr. 283.  Mr. O'Connor quit in frustration after three weeks because the job was impossible.  Moore Dep. Tr. 98.

119.  Mr. Simpson sat around talking sports with Paxton Cobb, a male temp.  Moore Dep. Tr. 235.  Mr. Simpson was very friendly with Paxton Cobb.  Moore Dep. Tr. 241.  He acted cordial and polite to him too.  Benton Dep. Tr. 283.  Mr. Simpson told Plaintiff Moore that he thought that Paxton Cobb was going to be an excellent candidate and would be successful in the Group. Moore Dep. Tr. 235.  Plaintiff Moore had to let Paxton Cobb go because he kept not showing up for work and had very low numbers, by far the lowest in the room.  Moore Dep. Tr. 256.

120.    Mr. Simpson buddied up with the male employees.
Moore Dep. Tr. 235.  Mr. Simpson walked past the female employees
without even saying hello.  Moore Dep. Tr. 241; Buonincontra Dep.
Tr. 20, 262.

121.    On or about March 8, 2001 Plaintiff Cifatte wrote a
letter, Cifatte Dep. Ex. 17, to Mr. Simpson, accusing him of
creating a hostile work environment.  Cifatte Dep. Tr. 240-41.
Plaintiff Cifatte wrote the letter because Mr. Simpson put her on
an EPD.  Cifatte Dep. Tr. 242.  Plaintiff Cifatte wanted to get
the facts out and document them.  Cifatte Dep. Tr. 247.  Plain-
tiff Cifatte handed Mr. Simpson his copy of the letter.  Cifatte
Dep. Tr. 248.  The following day, March 9, 2001, Mr. Simpson gave
Plaintiff Cifatte the two page March 9, 2001 memo criticizing her
performance and sat down with her to review the memo.  Cifatte
Dep. Tr. 247-49, 251 and Cifatte Dep. Ex. 17.  Mr. Simpson
subsequently gave Plaintiff Cifatte a formal EPD. Cifatte Dep.
Tr. 262 and Cifatte Dep. Ex. 19.  Plaintiff Cifatte sent a copy
of the March 8, 2001 letter to Ms. Stevens and they discussed it
when Plaintiff Cifatte was up in Human Resources talking about
the review that Mr. Simpson had given her.  Cifatte Dep. Tr. 246.

Ms. Stevens said that it was a threatening letter.  Cifatte Dep.
Tr. 246.

    122.  Plaintiff Moore felt that Mr. Simpson gave her a
detailed memo stating how to supervise the women as retaliation
for complaining about him.  Plaintiff Moore said it was Mr.
Simpson's way of saying that now he was going to play hardball
with her.  Moore Dep. Tr. 233-34, 248.

    123.  Plaintiff Benton went to Human Resources on Sept. 1,
1000 about the incident where Mr. Simpson screamed at Plaintiff
Cifatte on Aug. 30, 2000.  Benton Dep. Tr. 184.  After that she
noticed that more of her accounts were not getting registered and
she was having a hard time making quota due to Mr. Simpson's
handling of her accounts.  Benton Dep. Tr. 195.  Plaintiff Benton
had to see Ms. Stevens or Ms. Coleman over and over, at least
eight or ten times, on the same issues of retaliation by Mr.
Simpson.  Benton Dep. Tr. 195-69.  Plaintiff Benton told Ms.
Stevens that she thought that Mr. Simpson was prejudiced against
women but she did not listen.  Benton Dep. Tr. 200.

    124.  On Sept. 14, 2000, a short time after Plaintiff
Benton went to Human Resources about the Aug. 30, 2000 explosion,
Mr. Simpson sent out a memo attacking Plaintiff Benton by name

for taking too much time on her Sept. 13 and 14 breaks.  Benton

Dep. Tr. 182-83.  Plaintiff Benton complained to Human Resources

that Mr. Simpson was retaliating against her for going to HR on

him.  Benton Dep. Tr. 184.

125.    In June, 2001 Human Resources called Plaintiff Moore

upstairs to talk about the negative attitudes of the reps in the

ECO room.  Plaintiff Moore talked about the inadequacy of the

database.  Moore Dep. Tr. 125-26.

126.    Plaintiff Moore went to Human Resources to talk about

a lunch in which Plaintiff Moore had gone out with the women in

the ECO room at Mr. Simpson's suggestion to bond with them.

Moore Dep. Tr. 127.  The reps and Ms. Iaffaldano told Plaintiff

Moore about their past difficulties with Mr. Simpson.  This

included his shocking behavior, screaming and the like.  Moore

Dep. Tr. 165-68.  The women told Plaintiff Moore that they had

gone to HR but nothing had been done.  Plaintiff Moore told Ms.

Stevens that she was shocked that Mr. Simpson had been allowed to

act this way and even more shocked that nothing had been done by

HR.  Ms. Stevens replied that Human Resources had known about Mr.

Simpson's behavior but had not followed up on it.  She said

"these things had been reported" and "Gary Simpson had a file

71

this big." Moore Dep. Tr. 168. Later the Human Resources Department investigated, not Mr. Simpson's outrageous behavior, but his claim that the female reps had slandered him at the lunch with Plaintiff Moore. Benton Dep. Tr. 241-49.

127. Plaintiff Moore told Ms. Stevens of Human Resources that Mr. Simpson had sexually harassed her by rubbing his bottom against hers and also by rubbing his arm against hers. Mr. Simpson said "I always though that there was something up. There has been way too many complaints." Moore Dep. Tr. 134. Later Ms. Stevens told Plaintiff Moore "I have been trying to nail this guy for at least a year." Moore Dep. Tr. 137.

128. A short time after Plaintiff Moore complained of sexual harassment to Ms. Stevens and Ms. Coleman, Human Resources did a 180 degree turn and stopped paying attention to what Plaintiff Moore said. Everything changed. Moore Dep. Tr. 138.

129. In June, 2001 Plaintiff Moore met with Janine McManus, a person high up in Human Resources, and Mr. Simpson. Ms. McManus wanted to "repair the relationship" between Plaintiff Moore and Mr. Simpson. Plaintiff Moore explained all of the things going on in the ECO room, all of the reasons why the reps were unhappy, but Ms. McManus wasn't really listening. All she

wanted was for Plaintiff Moore to get along with Mr. Simpson.
Before anything could get done Mr. Simpson left for a meeting
with the president of the company.  Nothing was resolved.  Moore
Dep. Tr. 139-45, 148-49.

130.    Plaintiff Moore heard of Mr. Simpson's rages from
Dick Wajert, a/k/a Dick Weigert.  Moore Dep. Tr. 251-253.  Mr.
Wajert was a CPR rep, a counsel for Pitney Bowes employees.
Benton Dep. Tr. 175-77.  Plaintiff Benton went to Mr. Wajert when
she was unhappy with the "two" review Mr. Simpson gave her.
Benton Dep. Tr. 176-77.  Plaintiff Buonincontra had a full
meeting with Mr. Wajert on what was happening in the ECO room.
Buonincontra Dep. Tr. 159-62.  Plaintiff Buonincontra later went
to Mr. Wajert's successor as CPR rep, Paul Gorman, and also to
Gus Stepp at Pitney Bowes corporate HQ in Stamford.  Buonincontra
Dep. Tr. 156, 165-69.

131.    Plaintiff Benton told Ms. Stevens at Human Resources
of the memo which told Plaintiff Benton and Plaintiff Cifatte
that they could leave the ECO Department on only two days notice,
and that Plaintiff Moore had said that Mr. Simpson wanted them
out.  Benton Dep. Tr. 250-51.  Plaintiff Benton told Ms. Stevens

that it hurt to be told that your boss just wants you out.
Benton Dep. Tr. 250-51.

132.    Plaintiff Cifatte spoke with Ms. Stevens about her
"two" rating.  Plaintiff Cifatte asked Ms. Stevens to red flag
her personnel file and tell other managers that she, Ms. Stevens,
would hire her.  Plaintiff Cifatte was afraid that the other
managers would look at the two rating and not hire her.  Ms.
Stevens said that a "two" rating does not look good and "I
wouldn't hire you if you were a two."  Cifatte Dep. Tr. 166-67.

133.    Plaintiff Buonincontra complained to Ms. Coleman
about Mr. Simpson's rages and other unprofessional behavior.
They met in Ms. Coleman's office before the incident of Aug. 30,
2000.  Buonincontra Dep. Tr. 163-65.  Ms. Coleman said that she
was shocked but could do nothing because Ms. Stevens was on her
honeymoon.  Everything had to wait until Ms. Stevens came back.
Buonincontra Dep. Tr. 164-65.

### Simpson's Conduct Seriously Injured Plaintiffs

134.    Plaintiff Benton became depressed and, although she
was opposed to medications in general, and antidepressants in
particular, and did not want to be on antidepressants like the
other employees in the ECO Group, yielded to her doctor's advice

74

and went on Paxil, an antidepressant, in 2000.  Benton Dep. Tr.
43-44, 48-49, 59-62.  The Paxil helped Plaintiff Benton deal with
what was happening in the room.  Benton Dep. Tr. 60-61.  In
August of 2002, after a conversation with her doctor, Plaintiff
Benton stopped taking the Paxil because she felt that she did not
need it anymore.  Benton Dep. Tr. 44-46.

135.    The job was so emotionally stressful that Plaintiff
Benton had trouble sleeping while she was in the ECO Group.
Benton Dep. Tr. 12, 15.  She had trouble falling asleep.  She
would lie in bed and think about what had happened at work; try
to figure out things that Mr. Simpson had said.  Benton Dep. Tr.
14.  Plaintiff Benton would wake up in the middle of the night.
Benton Dep. Tr. 12.  She had never experienced any trouble
sleeping before or since.  Benton Dep. Tr. 12.  Every night in
2000 Plaintiff Benton took the prescription sleeping medication
Ambien.  She stopped taking it several months after she left the
ECO room.  Benton Dep. Tr. 11.

136.    Plaintiff Benton was prescribed Xanax, a tranquil-
izer, in 2000 to take as needed for nervousness and anxiety.  At
that time the nervousness and anxiety was constant.  Benton Dep.
Tr. 22-23, 46-47, 49-50.  The nervousness caused her to experi-

75

ence hand tremors and periodic heart spasms.  Benton Dep. Tr. 24.
The hand tremors started in March, 2000, when Plaintiff Benton
was being supervised by Mr. Simpson.  Benton Dep. Tr. 55-56.
Plaintiff Benton had never had hand tremors before.  Benton Dep.
Tr. 50-51.  They happened when she got extremely upset.  Benton
Dep. Tr. 54.  Plaintiff Benton hasn't had any tremors in quite a
while.  Benton Dep. Tr. 54.

137.  Plaintiff Benton was prescribed a nitroglycerine
spray for her heart condition in 2000.  Benton Dep. Tr. 10.  It
was to be used when needed and she used it quite often while
employed in the ECO room.  Benton Dep. Tr. 11.  Plaintiff Benton
already had an asthma inhaler which she used when she needed it,
such as when it was extremely muggy, humid or hot.  Benton Dep.
Tr. 66-67.  Plaintiff Benton used the inhaler when she became
extremely upset at work and had trouble breathing.  Benton Dep.
Tr. 67-68.

138.  Plaintiff Benton suffered a severe heart spasm which
caused her to leave work after she got the May 1, 2001, memo
about sighing and negative comments.  Benton Dep. Tr. 24-25, 224-
25 and Benton Dep. Ex. 16.  When Plaintiff Benton described her
symptoms to the cardiologist she had called because she was

having symptoms, he immediately called her into his office and put her in the hospital. Plaintiff Benton's blood pressure, usually extremely low, was extremely high. Benton Dep. Tr. 27. The doctor did a heart catheterization that same day and actually witnessed a heart spasm. Benton Dep. Tr. 25, 30-31. The doctor told Plaintiff Benton that the spasms had been caused by stress. Plaintiff Benton explained her situation and the doctor asked her why she continued to work where she was. Benton Dep. Tr. 31-36.

139.   Plaintiff Benton took early retirement from Pitney Bowes, although she got no money, only medical and a few other benefits, Benton Dep. Tr. 254, because she just couldn't stand her job. Benton Dep. Tr. 257. Plaintiff Benton confined her job search after leaving Pitney Bowes to medical offices because after her experience she couldn't take another corporate job. Benton Dep. Tr. 259.

140.   Plaintiff Buonincontra could not stop thinking about the problems in the room. They took over her weekends. Buonin-contra Dep. Tr. 277. Plaintiff Buonincontra was so anxious to get out of the ECO room that although she was a thirteen year employee and entitled to better she took a lower paying night shift job in another part of Pitney Bowes to escape. Buonin-

77

contra Dep. Tr. 176, 255-56. "I would have cleaned the bathrooms just to get out of there." Buonincontra Dep. Tr. 223.

141.   In February, 2000 Plaintiff Buonincontra began to experience muscle spasms in her neck due to stress. Buonincontra Dep. Tr. 10-11, 15. The muscles on both sides of her neck would tighten up and restrict the motion of her neck. The spasms affected Plaintiff Buonincontra's ability to eat. The spasms lasted varying amounts of time, between two hours and a day. Buonincontra Dep. Tr. 15-16. Plaintiff Buonincontra felt like her throat was closing and tightening, like she was choking. The spasm would trigger a panic attack. Buonincontra Dep. Tr. at 292-93. Plaintiff Buonincontra had never had muscle spasms like this before. Buonincontra Dep. Tr. 15.

142.   Plaintiff Buonincontra experienced the spasms more than once a week. Buonincontra Dep. Tr. 16-17. The spasms were more frequent on workdays. Buonincontra Dep. Tr. 17. Plaintiff Buonincontra's orthopedic doctor told her that they were likely due to stress after she described to him the stress she was under at work. Buonincontra Dep. Tr. 17-18, 278. Plaintiff Buonin-contra had been under stress in the workplace before, but not

stress like she was experiencing at Pitney Bowes at that time. Buonincontra Dep. Tr. 18.

143.   Plaintiff Buonincontra stopped having neck spasms shortly after she transferred to her new position at Pitney Bowes on April 3, 2001.  Buonincontra Dep. Tr. 23.  Plaintiff Buonincontra has never had any spasms in her new position in Pitney Bowes collections, Buonincontra Dep. Tr. 23, where she has done well, earning a "five" rating.  Only four employees out of forty-two in her department earned that rating.  Buonincontra Dep. Tr. 27, 35.

144.   The "two" rating Mr. Simpson gave Plaintiff Buonincontra would have been a big obstacle to her getting her new job if she had gotten it the usual way.  It was not an obstacle because Plaintiff Buonincontra got the new job through a very high ranking manager who knew her.  No one looked at her EPD or anything else.  Buonincontra Dep. Tr. 293-94.

145.   Plaintiff Buonincontra takes Paxil, an antidepressant.  Buonincontra Dep. Tr. 42.  It was prescribed for her around the time that she started getting muscle spasms.  Buonincontra Dep. Tr. 43.  Plaintiff Buonincontra started taking an antidepressant as a result of Mr. Simpson's discriminatory

conduct.  Buonincontra Dep. Tr. 277.  She was "consumed by
negativity seven days a week."  Buonincontra Dep. Tr. 278.
Plaintiff Buonincontra had never been on an antidepressant
before.  Buonincontra Dep. Tr. 45.  The Paxil dosage was highest
when Plaintiff Buonincontra was in the ECO Group room but has
since gone down.  Buonincontra Dep. Tr. 43-45.

146.  Plaintiff Cifatte noticed when she got home after the
explosion by Mr. Simpson on Aug. 30, 2000 that her chest was
tightening up in a way that it had never done before.  Cifatte
Dep. Tr. 191.  Plaintiff Cifatte called her doctor, went the next
day, and discovered that her blood pressure was at a serious
level, 200 over 100.  Cifatte Dep. Tr. 191.  Plaintiff Cifatte
took a sick day or two.  Cifatte Dep. Tr. 191-92.  Plaintiff
Cifatte was afraid of Mr. Simpson and remains so today.  Cifatte
Dep. Tr. 309-10.

147.  Plaintiff Cifatte started smoking again in 2000 at
age fifty.  She had stopped smoking at age twenty-two and had not
smoked in the interim.  Cifatte Dep. Tr. 115-16.  Plaintiff
Cifatte smoked about ten cigarettes a day.  Cifatte Dep. Tr. 116-
17.

148.    Plaintiff Cifatte was prescribed blood pressure additional medication in September, 2000 because her blood pressure was 200 over 100.  Her normal blood pressure was 138 over 80.  Cifatte Dep. Tr. 22-23.  After several months Plaintiff Cifatte's blood pressure declined and it returned to normal around January, 2002.  Cifatte Dep. Tr. 24-25.

149.    Plaintiff Cifatte was prescribed Paxil, an antide-pressant, in March of 1999.  Cifatte Dep. Tr. 26-27.  The does was 10 mg from March, 1999 until June, 2002, when it went to 40 mg.  Cifatte Dep. Tr. 27-28.  Since that time, as Plaintiff Cifatte has seen a psychiatrist, Dr. Levine, the dosage has declined.  It was 20 mg in February, 2003.  Cifatte Dep. Tr. 27-29.

150.    Plaintiff Cifatte sees Dr. Levine, a psychiatrist, for therapy.  Cifatte Dep. Tr. 30-31.  She was prompted to see Dr. Levine in June, 2002, by Mr. Simpson's conduct on Aug. 30, 2000.  Cifatte Dep. Tr. 31.  Plaintiff Cifatte suffered from depression, anxiety and panic attacks.  Cifatte Dep. Tr. 32.

151.    Plaintiff Cifatte experiences dizziness, lightheaded-ness, chest pounding and sweating when she gets a panic attack.  Cifatte Dep. Tr. 307.  She gets them when she remembers Aug. 30,

81

2000.  Cifatte Dep. Tr. 307.  They began to moderate around
August, 2002.  Cifatte Dep. Tr. 308.

152.  Plaintiff Cifatte felt like she couldn't do anything
after her experience with Mr. Simpson.  Cifatte Dep. Tr. 145.
Plaintiff Cifatte delayed going to a psychiatrist between August,
2000 and June, 2002 because she thought that she could overcome
the loss of self esteem she suffered on Aug. 30, 2000 herself.
Cifatte Dep. Tr. 32, 306.  Plaintiff Cifatte consulted with
numerous doctors about her anxiety.  Cifatte Dep. Tr. 33.

153.  Plaintiff Cifatte saw a gastrointestinal specialist
for pain in her chest and stomach in November, 2002.  Cifatte
Dep. Tr. 33-35.  Plaintiff was suffering from stress induced
inflamed intestines and irritable bowel syndrome (IBS).  Cifatte
Dep. Tr. 35, 37.  The IBS is related to anxiety about Mr. Simp-
son; Plaintiff Cifatte suffered an attack when she heard about
Plaintiff Benton's deposition and how Mr. Simpson was sitting
across from her.  Cifatte Dep. Tr. 309.

154.  In the fall of 2000 Plaintiff Cifatte started experi-
encing stress in her neck and back, tightness and muscle spasms.
Cifatte Dep. Tr. 42.  She saw a chiropractor, Cifatte Dep. Tr.

42-43, who attributed them to stress.  Cifatte Dep. Tr. 44.  The symptoms began to decline in January, 2002.  Cifatte Dep. Tr. 43.

155.    Plaintiff Cifatte still cannot stand anyone walking up behind her.  People have to announce themselves from ten feet away.  This is due to Plaintiff Cifatte's experience with Mr. Simpson.  Cifatte Dep. Tr. 304-05.

156.    Plaintiff Cifatte didn't look for sales jobs after she was terminated by Defendant Pitney Bowes because she had had a bad experience in the ECO Group.  Cifatte Dep. Tr. 143.  It wasn't that Plaintiff Cifatte felt that she was an incapable salesperson; she was good at sales.  Cifatte Dep. Tr. 144.  It was Mr. Simpson.  Cifatte Dep. Tr. 144.

157.    Plaintiff Cifatte's job search started to pick up after she saw Dr. Levine.  Cifatte Dep. Tr. 145.  She had to help the household out with money and "I just had to put one foot in front of the other every day."  Cifatte Dep. Tr. 145.

158.    Plaintiff Moore had intense anxiety and panic attacks as a result of Mr. Simpson's behavior.  Moore Dep. Tr. 245.  Plaintiff Moore never had attacks to that extent before.  Her earlier problems with anxiety were much less serious.  Moore Dep. Tr. 245-46.  Plaintiff Moore continued to have symptoms such as

stomach upset, diarrhea, heart palpitations and inability to sleep even after Brenda West replaced Mr. Simpson because she had to face him in the halls and deal with him.  Moore Dep. Tr. 246.

159.    Plaintiff Moore increased her dosage of Prozac approximately fifty percent when she was working at Pitney Bowes because in June, 2001 she started to feel intense anxiety and have  panic attacks.  Moore Dep. Tr. 17-19.  The dosage remained at that level until the middle of 2002, when she had a new job and was not receiving legal paperwork in connection with this case as often.  Moore Dep. Tr. 20-21.

THE PLAINTIFFS
DEBRA COSENTINO, ET AL

BY: _____
WILLIAM B. BARNES, ESQ.
     (CT0268)
Rosenstein & Barnes
1100 Kings Hwy. East
P.O. Box 687
Fairfield, CT 06432
Tel (203) 367-7922
Fax (203) 367-8110
E-mail wbarnes@rosenbar.com

84

## **CERTIFICATION**

A copy of the foregoing was mailed first class mail to the following persons on Feb. 17 , 2004:

Lawrence Peikes, Esq.
Wiggin & Dana, LLP
400 Atlantic St.,
P.O. Box 110325
Stamford, CT 06911-0325

WILLIAM B. BARNES, ESQ.